UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STEVEN J. DORN     PLAINTIFF

v.     No. 3:20-cv-118-BJB

NEIL S. DOMINIQUE     DEFENDANT

\* \* \* \* \*

OPINION & ORDER

    In his hit song "Right My Wrongs," Bryson Tiller declares: "There's a time and a place for all this / This is not the place for all this." BRYSON TILLER, RIGHT MY WRONGS (RCA Records 2015). Tiller is telling his girlfriend that the time is not right to talk about problems in their relationship. That same message could also apply to this lawsuit—brought by Tiller's former manager, Steven Dorn, against Tiller's current manager, Neil Dominique. Dorn had a time and a place to bring his claims against Dominique. But because 2020 was not that time, the Court grants the motion to dismiss.

I.

    At this stage of the case, the Court accepts Dorn's version of the facts as true. *See Rembisz v. Lew*, 590 F. App'x 501, 504 (6th Cir. 2014). According to him, the story begins in late 2013 or early 2014. *See* Amended Complaint (DN 8) ¶ 14. That's when Steven Dorn, a Kentucky resident and business manager for athletes and musicians, first met Bryson Tiller, an aspiring R&B artist from Louisville. *Id.* At that meeting Tiller asked Dorn to serve as his manager. ¶ 15. Dorn declined Tiller's offer for two reasons: first, because Dorn didn't think that Tiller was ready to treat the music business seriously, and second, because Dorn understood that Tiller had signed an exclusive recording agreement with Diamond Group Enterprises, LLC. ¶¶ 15–16.

    Fast forward a year. In October 2014 Tiller approached Dorn again and asked a second time if Dorn would manage him. ¶ 17. This time Dorn said yes; by then Tiller and Diamond Group had ended their relationship. *Id.* Dorn and Tiller agreed that "Dorn would initially fund Tiller's career and the business enterprise, and after all expenses were recouped, Dorn would receive 50% of all of Tiller's earnings stemming from the music side of the business." ¶ 18. Dorn and Tiller also agreed to form a Kentucky limited liability company that would run all their music ventures— including, one day, recruiting and signing other musicians. *Id.* Stripped to its core,

this agreement made him and Tiller "equal partners." *Id.* And they were for the next couple of months. ¶¶ 19–21.

Then, in January 2015, Dorn and Tiller signed a written contract making Dorn the "sole and exclusive personal manager" of Tiller for the next two years and providing that Dorn would receive "twenty percent … of all net compensation that [] Tiller receive[d] from any and all existing entertainment industry related sources … and any and all entertainment industry related agreements." Management Agreement (DN 8-1) ¶¶ 1–3; *see also* Am. Compl. ¶¶ 22–23.

Right after that contract was signed, Tiller's career began to take off. Am. Compl. ¶¶ 27–30. With buzz for Tiller growing, he and Dorn met with a number of players in the music industry, including Neil Dominique in January 2015. ¶¶ 30–31. Dominique worked in L.A. at the cable music network ReVolt TV, which Dorn and Tiller urged to feature Tiller's music videos. ¶ 31.

Tiller left that meeting with a bug in his ear. According to Dorn, Dominique "furtively" began "feed[ing] Tiller a false narrative based on knowingly false information about Dorn's reputation and character," with the aim "to convince Tiller to breach his contract with Dorn and sign exclusively with Dominique." ¶¶ 52, 66. Dominique also called Tiller numerous times to deride Dorn as inexperienced, ineffective, and disliked in the industry. ¶¶ 40–41.

Dominique's plan became apparent in March 2015, when Tiller told Dorn that Dominique would serve as a "co-manager" alongside Dorn. ¶ 32. Tiller also declared that Dominique would receive a five-percent commission on Tiller's net income, which would come from Dorn's twenty-percent commission, reducing Dorn's commission to fifteen percent. *Id.* Dorn says that Tiller gave him no choice: either work with Dominique or get cut out of the business. *Id.* So Dorn acquiesced and agreed to manage Tiller in tandem. ¶¶ 32–35. Shortly thereafter, the three agreed that Tiller would sign with RCA Records instead of OVO Sound. ¶¶ 32–35, 44.

The relationship between Dorn and Dominique grew more fraught in April 2015 when Tiller formed a corporation in Delaware called Trapsoul, Inc. ¶ 43. Dorn asserts that Tiller directed the proceeds from his RCA record deal to Trapsoul, Inc., rather than to the Kentucky corporation as Tiller and Dorn originally planned. ¶¶ 45–46. And although Dorn received fifteen percent of the advance of the RCA deal, Trapsoul helped Dominique and Tiller divert at least some of the amount that Dorn says he was owed. ¶¶ 46, 48.

Days after Dorn learned about Trapsoul, Inc., he received a revised management agreement from Tiller and Dominique's lawyers proposing new terms and a fifteen-percent commission for Dominique. ¶ 49. Dorn refused to sign. ¶ 50. Around the same time, Tiller heard rumors that Dorn had spread false information

about Tiller's career and his record deal, including about his deal with RCA. ¶ 53. According to Dorn, Dominique was the source of these rumors, intended to sow doubt in Tiller's mind about Dorn's work. ¶¶ 52, 54.

In June 2015 Tiller fired Dorn and named Dominique as his sole manager. ¶¶ 60–62. So Dorn sued Dominique for tortious interference with contractual relations and prospective business advantage. ¶¶ 71–84. But he waited nearly five years—until February 12, 2020—to do so.

## II.

Dominique first asks the Court to dismiss this lawsuit for lack of personal jurisdiction. *See* Motion to Dismiss (DN 7) at 6–15 (citing Fed. R. Civ. P. 12(b)(2)). He's wrong. A court in Kentucky may exercise jurisdiction over Dominique based on his travel, phone calls, and business dealings in the Commonwealth. These satisfy both the "forum state's long-arm statute and the due process requirements of the Constitution." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996) (quotation omitted). Dorn, resting on his amended complaint and two affidavits, has carried his "burden of establishing the existence of personal jurisdiction." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 548 (6th Cir. 2016); *see also Serras v. First Tenn. Bank Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989).

**Kentucky's Long-arm Statute.** Kentucky's long-arm statute permits a court to "exercise personal jurisdiction over a person who acts directly … as to a claim arising from" nine categories of enumerated activities. KRS § 454.210(2)(a)(1)–(9). Dorn argues, based on the same basic narrative, that the first four subsections support personal jurisdiction. Response (DN 10) at 5–9. Tiller and Dorn both lived in Kentucky, their relationship rested on a Kentucky-governed contract, Dominique visited and called Tiller in Kentucky many times regarding that contract, and Dominique managed Tiller and earned significant money for that work. *Id.* These facts are sufficient to establish jurisdiction under the first subsection.

The record before the Court makes clear that Dominique "[t]ransact[ed] … business in this Commonwealth." KRS § 454.210(2)(a). Dominique affirmatively and purposefully reached out to Tiller in Kentucky to transact business. Cox Aff. (DN 8-2); Dorn Aff. (DN 10-1); *Hall v. Rag-O-Rama, LLC*, 359 F. Supp. 3d 499, 509 (E.D. Ky. 2019) ("[T]he Sixth Circuit has put great emphasis on a defendant's affirmative act of reaching out to a plaintiff whom he knows to be in the forum state.") (citing, *e.g.*, *Air Prods. & Controls v. Safetech, Int'l*, 503 F.3d 544, 551 (6th Cir. 2007)). According to Dorn, Dominique made multiple telephone calls "to convince Tiller to violate his [a]greement with Dorn," who like Tiller was a Kentucky resident. Am. Compl. ¶ 42; Cox Aff. ¶¶ 13–16; Dorn Aff. ¶¶ 12, 17–20. This by itself could be enough: "Making phone calls …, standing alone, 'may be sufficient to confer jurisdiction on the foreign defendant where the phone calls … form the bases for the

3

action.'" *See Eat More Wings, LLC v. Home Market Foods, Inc.*, 282 F. Supp. 3d 965 969–70 (E.D. Ky. 2017) (quoting *Rice v. Karsch*, 154 F. App'x 454, 460 (6th Cir. 2005)). And those telephone calls do indeed form the basis of this case: Dorn says Dominique was telephoning Tiller in Kentucky to recruit him as a client. Cox Aff. ¶¶ 15–16; Dorn Aff. ¶¶ 12, 17; *Hall*, 359 F. Supp. 3d at 505 ("[T]he recruitment and hire of a Kentucky executive-level employee" suggests that a defendant "'transact[ed] … business in this commonwealth.'"). Dorn also maintains that as part of this ongoing relationship Dominique traveled to Kentucky at least twenty times to conduct business with Tiller. Dorn Aff. ¶¶ 12, 25; *see, e.g.*, *Material Handling Sys., Inc. v. Cabrera*, No. 3:21-cv-463, --- F. Supp. 3d. ---, 2021 WL 5236875, at *6 (W.D. Ky. Nov. 10, 2021) (explaining that a defendant's "visit and broader employment relationship" likely provide sufficient connection with Kentucky to support jurisdiction under KRS § 454.210(2)(a)(1)). All of this qualifies as transacting any business in this commonwealth. *Hall*, 359 F. Supp. 3d at 506.

Dominique sings a different tune. He contends that Tiller and Dorn reached into California to solicit Dominique's services. MTD at 9. This, according to Dominique, is the sort of "unilateral activity of those who claim some relationship with a non-resident defendant" that "cannot satisfy the requirement of contact with the forum State." *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1301 (6th Cir. 1989) (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)). But Dorn's claims do not arise from his outreach to Dominique in California about televising a music video; they instead relate to Dominique's outreach to Dorn and Tiller in Kentucky. Resp. at 5–9.

Later travel to Kentucky, Dominique argues, occurred "well after the events at issue in Dorn's Complaint" and is therefore irrelevant to the jurisdictional inquiry. MTD at 9. The Sixth Circuit, however, has held that subsequent trips to a state are still evidence that a defendant transacted business there during the time period in question. *See Beydoun v. Wataniya Resturants Holding, Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014) (single recruiting visit sufficient, and subsequent trips relevant, to show defendant transacted business in forum state). So even if each visit occurred after June 2015, Dominique's repeated travel to Kentucky tends to show that his telephone calls to Tiller were made in contemplation of an ongoing contractual relationship in Kentucky. *Id.*

And Dorn is right that his allegations concern more than just an isolated contract; they relate to the sabotage of Tiller's relationship with Dorn in Kentucky. This is more than enough to conclude that Dominique transacted business in Kentucky within the meaning of the Commonwealth's long-arm statute.

**Federal Due Process.** The U.S. Constitution's Due Process Clause requires "minimum contacts … with the forum State … such that [a defendant] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.*

4

*v. Woodson*, 444 U.S. 286, 291, 297 (1980). Due process allows for two types of personal jurisdiction: general and specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Dorn argues for specific jurisdiction only. This requires "(1) purposeful availment of the privilege of acting in the forum state or causing a consequence in the forum state, (2) a cause of action … aris[ing] from activities in the state, and (3) a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Schneider v. Hardesty*, 669 F.3d 693, 701 (6th Cir. 2012) (quotation omitted).

*First,* purposeful availment ensures that defendants will not fall within the jurisdiction of a court because of "random, fortuitous, or attenuated contacts," or because of the "unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotations omitted). "With respect to interstate contractual obligations, the Supreme Court has emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions for the consequences of their activities.'" *Air Prods.*, 503 F.3d at 551 (quoting *Burger King*, 471 U.S. at 473). Although contracting with an out-of-state party alone does not automatically establish sufficient minimum contacts, "the presence of certain factors in addition to the contract will be found to constitute purposeful availment." *Id.* (quoting *Burger King*, 471 U.S. at 478–79). These factors include "prior negotiations and contemplated future consequences," "the terms of the contract," and "the parties' actual course of dealing." *Id.*

Nothing random, fortuitous, or attenuated characterized Dominique's contacts with Kentucky. He repeatedly called Tiller in Kentucky to interfere with Tiller and Dorn's contractual relationship. Dorn Aff. ¶ 12; *see also Air Prods.*, 503 F.3d at 551. Furthermore, Dominique made those calls intending to begin a long-term business relationship with Tiller. Eventually he succeeded and, as part of that relationship, Dominique made hundreds of telephone calls to Tiller in Kentucky and traveled to Kentucky at least twenty times. Dorn Aff. ¶¶ 12, 25. Dominique affirmatively and voluntarily reached out to Tiller, a sought-after R&B artist, to enter into a business relationship. ¶ 12. As such, Dominque could have foreseen that his conduct would land him in a Kentucky court. *See Legacy Hemp LLC v. Terramax Holdings Corp.*, No. 5:20-cv-90, 2021 WL 5816817, at *4 (W.D. Ky. Dec. 7, 2021) (citations omitted) ("An 'ongoing' and 'continuing' relationship suggests that a defendant purposefully availed itself to a forum; a relationship based merely on an 'isolated transaction' does not." (quotation omitted)).

*Second*, the "arising from" criterion "requires that [a defendant's] contacts be 'related to the operative facts of the controversy.'" *MAG IAS Holdings v. Schmückle*, 854 F.3d 894, 903 (6th Cir. 2017). The Sixth Circuit evaluates this requirement using a "lenient" standard, asking only whether "'the operative facts are at least marginally related to the alleged contacts' between the defendant and the forum." *Lyngaas v.*

5

*Ag*, 992 F.3d 412, 423 (6th Cir. 2021) (quoting *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)). Dominique's contacts are, at the very least, marginally related to Dorn's claims for tortious interference. Dominique's phone calls caused Tiller to terminate his agreement with Dorn. Dorn Aff. ¶¶ 12, 19. Dominique made those phone calls hoping to replace Dorn as Tiller's exclusive manager, a role which Dominique knew would entail further contact with the Kentucky forum. ¶¶ 12, 19, 25.

*Third*, jurisdiction is reasonable. When, as in this case, the first two criteria are met, "an inference of reasonableness arises" and "only the unusual case will not meet this third criteria." *Air Prods.*, 503 F.3d at 554 (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1461 (6th Cir. 1991)). And Dominique doesn't really contest reasonableness. Certainly not by pointing to anything that would overcome this inference based on (1) "the burden on the defendant;" (2) "the interests of the forum State;" and (3) "the plaintiff's interest in obtaining relief." *Beydoun*, 768 F.3d at 508.

Any burden is reduced because Dominique regularly traveled to the forum state. *See Contech Bridge Sols., Inc. v. Keaffaber*, No. 1:11-cv-216, 2011 WL 5037210, at *10 (S.D. Ohio Oct. 24, 2011). Furthermore, because Tiller and Dorn were Kentucky residents, Kentucky has a strong interest in adjudicating the controversy. *See S. Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 385 (6th Cir. 1968). Dorn also asserts that Dominique's actions caused significant financial damage, and Dominique fails explain why Dorn does not have an interest in obtaining relief. Resp. at 2. This is not the "unusual case" where exercising personal jurisdiction would be unreasonable.

### III.

Dominique next argues that Dorn's Amended Complaint should be dismissed for failure to state a claim. *See* MTD at 15–23; Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Dominique argues that Dorn's allegations, even accepting them as true, would not allow him to recover because he filed this lawsuit after the statute of limitations expired before he filed. MTD at 21–23. If this case is governed by the one-year defamation statute of limitations, Dominique is right. But if the five-year catch-all statute of limitations that typically applies to tortious-interference claims controls, Dorn's suit is timely.

KRS § 413.120(6) creates a five-year statute of limitations for "injur[ies] to the rights of the plaintiff, not arising on contract and not otherwise enumerated." Although it doesn't specifically mention tortious interference, Kentucky courts have interpreted this provision to mean that "tortious interference claims are subject to the five-year statute of limitations period set forth in KRS § 413.120." *Cameo, LLC v. Techni-Coat Int'l, N.V./S.A.*, No. 5:14-cv-256, 2017 WL 690194, at *4 (E.D. Ky. Feb. 21, 2017). By contrast, Kentucky law specifically provides a one-year limitations

period for defamation claims. *See* KRS § 413.140(1)(d); *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 281 n.7 (Ky. 2014).

Shouldn't the five-year tortious-interference statute of limitations apply to Dorn's tortious-interference claims? Not according to the "firmly established" principle of Kentucky law that "a statute of limitations which specifically mentions a recognized tort applies to all actions founded on that tort regardless of the method by which it is claimed the tort has been committed." *Lashlee v. Sumner*, 570 F.2d 107, 109 (6th Cir. 1978) (citing *Skaggs v. Stanton*, 532 S.W.2d 442 (Ky. 1975)). In other words, if the same core factual allegations underlie two tort claims, and those torts carry different limitations periods, then the shorter period applies. The nature of the underlying claim, not the specific tort pled, determines the statute of limitations. In *Skaggs*, 532 S.W.2d at 443, for example, the Kentucky Supreme Court held that Kentucky's one-year statute of limitations for criminal conversation applies to "all actions founded on interference with marriage," even though the plaintiff tried to characterize the claim as one for the tort of "alienation of affections," which according to the plaintiff carried a longer limitations period. But what mattered, according to the court, was not the label applied to the claim, but rather the facts the claim rested on. "A specific statute of limitations," the court explained, "covers all actions whose real purpose is to recover for the injury addressed by it in preference to the general statute of limitations." *Lashlee*, 570 F.2d at 109 (citing *Carr v. Tex. E. Transmission Corp.*, 344 S.W.2d 619, 620 (Ky. 1961) (holding that a statute of limitations governing tort actions applied to a contract claim because the "object" of the claim was to recover in tort for injuries to the plaintiff's cattle)). And the Kentucky Supreme Court, in *Carr*, noted that the more specific limitations provision for libel and slander trumped the more general catch-all provision. 344 S.W.2d at 620. Notably, this interpretation doesn't render the catch-all limitations provision a nullity, even with respect to tortious interference: the statute may still apply to interference through means other than alleged defamatory statements.

Courts have explained that this rule is meant to prevent litigants from strategically characterizing (or recharacterizing) their claims in order to avoid more stringent statutes of limitations. *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1000 (10th Cir. 2002). That principle seems sensible enough, particularly if both the tort and the applicable limitations period are creatures of judge-made common law: courts created those rules in the first place and, consistent with principles of stare decisis, are presumably free to modify the limits they themselves created. But what about limitations periods the legislature prescribed? Are judges free to edit not only their own work, but also the legislature's, based on pleading concerns the legislature may have considered, rejected, or never perceived? Perhaps surprisingly,[1] courts have consistently answered "yes," routinely applying

---

[1] Then again, perhaps it's not so surprising that judges would lay claim to authority, at the expense of the legislature, on questions of civil procedure. It's also possible that courts (although they don't appear to have spoken in these terms) have rationalized the rule's

this principle to enforce a shorter limitations period even when a legislature has provided a longer period for a particular cause of action. *See, e.g., id.* (applying shorter defamation statute of limitations even though the only claim was tortious interference, to which a longer statutory limitations period applied); *MYD Marine Distributors, Inc. v. Donovan Marine, Inc.*, No. 07-cv-61624, 2009 WL 701003, at *2 (S.D. Fla. Mar. 16, 2009) (same).

And courts have applied this rule even when the plaintiff didn't bring a defamation claim and a statute specifically dictated the limitations period for the non-defamation tort the plaintiff did bring. *See id.*; *Katz v. Travelers*, 241 F. Supp. 3d 397, 406–07 (E.D.N.Y. 2017) (applying statutory defamations limitations period instead of statutory tortious-interference claim); *Pro. Investigating & Consulting Agency, Inc. v. SOS Sec., LLC*, No. 2:19-cv-3304, 2020 WL 209093, at *4 (S.D. Ohio Jan. 14, 2020) (same). So a federal district judge, applying the precedents of Kentucky courts in this diversity case, is bound to apply this principle—however counterintuitive—to Dorn's claims in this case.

Indeed, the Sixth Circuit used Kentucky's defamation statute of limitations for a related tortious-interference claim in *Lashlee v. Sumner*, 570 F.2d at 109. The Court of Appeals held that when "[t]he underlying wrong which the complaint alleges is defamation," such that "[t]he gist of the entire action" is defamation, "the one-year statute of limitations applies to all counts." *Id.*[2] So if the gist of Dorn's tortious-

---

application to statutory limitations periods based on the canonical presumption that statutes typically do not implicitly abrogate common-law rules like this one absent a clear indication otherwise. *See, e.g.*, *United States v. Texas*, 507 U.S. 529, 534 (1993).

[2] In each of the decisions cited by Dominique, the plaintiff pled both a tortious-interference claim and a defamation claim. *See Lashlee*, 570 F.2d at 108; *Ceres Protein, LLC v. Thompson Mech. & Design*, No. 314-cv-491, 2016 WL 6090966, at *1 (W.D. Ky. Oct. 18, 2016); *Tucker v. Heaton*, No. 5:14-cv-183, 2015 WL 3935883, at *1 (W.D. Ky. June 26, 2015); *McIntosh v. E-Backgroundchecks.com, Inc.*, No. 5:12-cv-310, 2013 WL 1187038, at *1 (E.D. Ky. Mar. 20, 2013); *Kindoll v. Gonterman*, No. 2003-ca-2561, 2005 WL 386880, at *1 (Ky. Ct. App. Feb. 18, 2005). Dorn did not plead a defamation claim. But that doesn't matter under the Sixth Circuit's analysis in *Lashlee*, which focused on the "underlying wrong" and the facts which the claims "spring[] from," not which claims are pled. *See Lashlee*, 570 F.2d at 109. A test that turned on the plaintiff's pleading choices obviously wouldn't well serve the purpose discussed above of evading a limitations defense through artful pleading. Out-of-circuit precedents applying similar state laws have almost uniformly held that a defamation statute of limitations can still apply to a tortious-interference claim even if a plaintiff does not assert a defamation claim. *See, e.g.*, *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1000 (10th Cir. 2002); *Tanksley v. Rice Cnty. Sheriff's Off.*, No. 19-1342, 2021 WL 1210280, at *21 (D. Kan. Mar. 31, 2021); *MYD Marine Distributors, Inc. v. Donovan Marine, Inc.*, No. 07-61624, 2009 WL 701003, at *2 (S.D. Fla. Mar. 16, 2009); *Katz v. Travelers*, 241 F. Supp. 3d 397, 407 (E.D.N.Y. 2017); *Pro. Investigating & Consulting Agency, Inc. v. SOS Sec., LLC*, No. 2:19-cv-3304, 2020 WL 209093, at *4 (S.D. Ohio Jan. 14, 2020); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 225 (S.D.N.Y. 2013).

interference claims is defamatory remarks made by Dominique regarding Dorn's representation of Tiller, the statute of limitations for those claims is one year, not five.

Dorn's allegations can in fact be boiled down to one sentence: Dominique regularly "[fed] Tiller a false narrative based on knowingly false information about Dorn's reputation and character, and … the aim in doing so was to convince Tiller to breach his contract with Dorn and sign exclusively with Dominique." Am. Compl. ¶ 66. All Dorn's allegations are, at their core, related to Dominque's false statements. Why did Tiller hire Dominique? ¶ 32. Why did Tiller form Trapsoul, Inc. and direct funds away from Dorn? ¶¶ 43–46. Why did Tiller hear from others that Dorn was wrongly claiming that Tiller had actually signed with, or was intending to sign with, OVO and not RCA? ¶ 53. The answer to each question is that Dominique "funnel[ed] false information to outsiders" and told Tiller that "Dorn ha[d] no experience in the music industry, that no one in the business like[d] Dorn, and that Dorn was holding Tiller's career back." ¶¶ 40, 58.

Dorn contends the case is about an overall scheme "not limited to" falsehoods, but that is not the right test. Resp. at 22. The question is whether the "gist" of the entire action is about defamatory statements. *See Lashlee*, 570 F.2d at 109. In any event, calling Dominique's conduct an "ongoing scheme" does not change the nature of the claim. The factual allegations supporting Dorn's tortious-interference claims are the same factual allegations that would support a defamation claim. *See Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014). And Dorn never specifies what "direct actions" by Dominique do "not involv[e] statements at all." Resp. at 22. All of Dominique's allegedly tortious interference either was a false statement or was brought about by false statements.

Dorn concludes that the gist of the action is "the monetary loss [he] suffered as a result of [Dominique's] interference with an actual contract (or expectancy)." Resp. at 22. But the Sixth Circuit has directed courts to look at the "underlying wrong," not the resulting harm. *See Lashlee*, 570 F.2d at 109. If the plaintiff's claims "spring[] from" that wrong, then its limitations period applies. According to Dorn's complaint,

---

One federal district court applying Maryland law reached the opposite conclusion. *See Richardson v. Selective Ins. Grp., Inc.*, No. 06-2594, 2007 WL 1657423, at *6 (D. Md. May 31, 2007) (relying on *Allen v. Bethlehem Steel Corp.*, 547 A.2d 1105, 1108 (Md. Ct. Spec. App. 1988)). But subsequent authority has cast doubt on whether *Richardson* still represents the current state of Maryland law. *See Millison v. Wilzack*, 551 A.2d 899, 902 (1989) ("[I]t is not the manner in which an action is characterized, but, rather, its essential characteristic, that determines whether a statute of limitations applies."); *Smith v. McGraw*, No. 10-cv-02310, 2012 WL 603238, at *9 (D. Md. Feb. 23, 2012) (similar). Regardless of its continuing validity, *Richardson*'s treatment of Maryland law obviously doesn't control this Court's application of Kentucky law.

his monetary loss springs exclusively from Dominque's allegedly false statements, making the gist of his claim one for defamation. *Id.*

So the same conduct that could give rise to a defamation claim underlies Dorn's claims for tortious interference. The statute of limitations governing the former therefore applies to the latter. Dorn admits that the limitations period on his causes of action began to run in June 2015, almost five years before he filed this lawsuit. *See* Resp. at 22–23. Dorn's claims are therefore barred by the one-year limitations period.

## ORDER

The Court denies Dominique's motion to dismiss for lack of jurisdiction (DN 7), but grants Dominique's motion to dismiss for failure to state a claim (DN 9), and will enter final judgment in favor of Dominique.

Benjamin Beaton, District Judge
United States District Court

June 23, 2022