UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STEVEN J. DORN                                                              PLAINTIFF

v.                                                                  No. 3:20-cv-118-BJB

NEIL S. DOMINIQUE                                                          DEFENDANT

\* \* \* \* \*

### OPINION & ORDER

Before the Court in this business-tort dispute are two motions, one from each side. Plaintiff Steven Dorn, the jilted former manager of R&B star Bryson Tiller, moves to set aside (DN 87) portions of the Magistrate Judge's order (DN 81) denying sanctions for spoliation. And Defendant Neil Dominique, Tiller's new manager, moves for summary judgment (DN 50) on Dorn's claims. Both motions fail.

### I. THIS DISPUTE

Today, Bryson Tiller is an R&B star with a triple-platinum album, multiple top-ten singles, and three Grammy nominations under his belt. But back in 2014, he was a relative unknown, posting mixtapes on Soundcloud between shifts at Papa John's in Louisville. *See* Elias Leight, *Bryson Tiller: Drake, Apple Music and the Making of a Trap-Soul Star*, ROLLING STONE (Oct. 30, 2015).

Back then, Dorn says, he was responsible for finding Tiller and lifting him from obscurity. In October 2014, he agreed to manage Tiller and pay his living expenses in exchange for half of Tiller's music revenues. *See Dorn v. Dominique*, 2022 WL 2276360, at \*1 (W.D. Ky. June 23, 2022); 2017 Steven Dorn Deposition (62-2) at 80. For a time, the partnership worked well. In January 2015, Dorn and Tiller "signed a written contract making Dorn the 'sole and exclusive personal manager' of Tiller for the next two years" in exchange for "'twenty percent … of all net compensation'" from Tiller's entertainment-related ventures. *Dorn*, 2022 WL 2276360, at \*1 (quoting Management Agreement (DN 8-1) ¶¶ 1–3). They also set up an LLC to house the industry work they intended to do. Right after that, "Tiller's career began to take off." *Id.*

But as it did, Defendant Neil Dominique—a fledgling manager with connections to industry powerbrokers including Sean "Diddy" Combs—came into the picture. *See* 2018 Bryson Tiller Deposition (DN 50-1) at 89–91. Tiller and Dorn met Dominique through Rich Gretah, a Miami barber with music-business connections. And over phone calls and a meeting in Los Angeles, Dominique expressed interest in

1

bringing Tiller into his network. *See* 2020 Neil Dominique Deposition (DN 62-8) at 18:11–19:13. Dorn alleges, however, that Dominique's interest wasn't altruistic. On Dorn's telling, Dominique "'furtively' began 'feed[ing] Tiller a false narrative based on knowingly false information about Dorn's reputation and character,' with the aim 'to convince Tiller to breach his contract with Dorn and sign exclusively with Dominique.'" *Dorn*, 2022 WL 2276360, at *1 (quoting Amended Complaint (DN 8) ¶¶ 52, 66). This covert smear campaign, Dorn alleges, fulfilled its aim. After Dominique got involved, Tiller wrote him into the management agreement as a "co-manager" entitled to five percent of his gross income. Draft Co-Management Agreement (DN 50-9) at 2. Then Tiller signed a deal with RCA records and formed a Delaware Corporation, Trapsoul Inc., to receive the proceeds of the deal—rather than the LLC he'd formed with Dorn. *Dorn*, 2022 WL 2276360, at *2. Finally, in June 2015, Tiller cut Dorn out of the picture altogether: "fir[ing] Dorn and nam[ing] Dominique as his sole manager." *Id.*

In response, Dorn sued Tiller and Tiller's entertainment lawyer in other jurisdictions. But he also sued Dominique in the case now before this Court, alleging tortious interference with Dorn's contract and (in a subsequent amended complaint) tortious interference with Dorn's "prospective business advantage"—that is, his anticipated future business with Tiller. *See* Amended Complaint ¶¶ 71–77 (tortious interference with contract); ¶¶ 78–84 (tortious interference with prospective business advantage). After a statute-of-limitations motion to dismiss, a personal-jurisdiction scuffle, and an appeal, *see Dorn v. Dominique*, 2023 WL 2543714 (6th Cir. Mar. 14, 2023), the parties headed into discovery.

Now, two motions are before the Court.

First, Dorn moved for sanctions, asserting that Dominique deleted texts and emails in a manner suggesting those messages cut against Dominique's case. *See generally* Motion for Sanctions (DN 47). Magistrate Judge Lindsay denied the motion, Evidentiary Order (DN 81) at 21, but Dorn objected and now asks the Court to set aside parts of Judge Lindsay's order, Motion to Set Aside (DN 87).

Second, Dominique moves for summary judgment (DN 50) on the two tortious-interference claims. As Dominique reads the record, Dorn has no evidence that anything Dominique said influenced Tiller's decision to part ways with Dorn—so Dorn can't possibly persuade a reasonable jury that his actions caused any alleged contractual or business interference.

## II. Objections to the Magistrate Judge's Order

The sanctions motion comes first, because—as Dorn stresses—an adverse inference could affect the Court's summary-judgment decision. *See* Dorn's Response to Motion for Summary Judgment (DN 62) at 14.

2

The parties didn't get far into discovery before trouble arose. Dorn asked Dominique to produce "all communications between [Dominique] and Tiller regarding … [Dorn]," "all documents regarding … [Dorn]," and "all communications between [Dominique] and any third party regarding … [Dorn]." Dominique's First Set of Requests for Production (DN 47-4) at 15–17. In response, Dominique reproduced some documents he'd already turned over during past litigation between Dorn and Tiller. *See* Evidentiary Order at 3–4 (summarizing the discovery in that litigation). But Dorn insisted that this production was incomplete because Dominique had "permanently deleted" some of his "text messages and emails." Motion for Sanctions (DN 47-1) at 12. Dominique, he said, switched phone numbers in 2019 and "lost all of his text messages" from before then because he'd never backed them up. *Id.* And Dominique also "continuously deleted emails" from his main inbox when he ran out of storage space. *Id.* at 13. Plus, since 2015, Dominique had somehow lost access to four other email accounts that may have contained responsive documents. *See id.* at 14–15. To back up his claim that this evidence was important, Dorn pointed to Tiller's testimony that Dominique and Tiller had texted about the decision to fire Dorn, *id.* at 14, and emails produced by Tiller that were directed to or from Dominique's inaccessible accounts, *id.* at 15–16.

### A. The Magistrate Judge's Sanctions Order

To remedy this alleged misconduct, Dorn moved for two sanctions: an adverse inference and attorney's fees. Motion for Sanctions at 19. The Magistrate Judge agreed that Dominique had indeed lost texts and emails. Further, the missing evidence couldn't be (completely) substituted with production from Tiller because Dorn's request also covered communications between Dominique and third parties. Evidentiary Order at 6–7. Judge Lindsay next found that Dominique had a duty to preserve this electronically stored information (or "ESI") since at least 2017, when Dominique received a subpoena in prior litigation. *Id.* at 10, 12. Dominique's homebrewed "delete-when-full" approach to records retention, Judge Lindsay held, was unreasonable. *Id.* at 12–13.

Judge Lindsay did not, however, impose sanctions. Federal Rule of Civil Procedure 37(e)(1), he observed, authorizes a court to "order measures no greater than necessary to cure the prejudice suffered by the party claiming spoliation." *Id.* at 15. And in Judge Lindsay's view, Dorn couldn't show prejudice without more "evidence … that the deleted ESI likely would have been in fact what [Dorn] says it is." *Id.* at 17. Without that showing of prejudice, Judge Lindsay declined to impose sanctions under Rule 37(e)(1). *Id.* at 21.

Dorn unsurprisingly agrees with Judge Lindsay's findings that Dominique did indeed lose irreplaceable ESI while under a duty to preserve it. *See* Motion to Set

3

Aside at 4, 6. And Dominique doesn't argue otherwise. So the only finding in question is whether these facts warrant sanctions.

### B. Dorn's Objections

Dorn objects to Judge Lindsay's prejudice analysis. He principally complains that Judge Lindsay improperly laid the burden on him to show prejudice and should have found that he carried that burden in any event. *Id.* at 6, 8–16.

But the Court needn't address Dorn's prejudice arguments because the main sanction he seeks—an adverse inference—is unavailable under the Federal Rules of Civil Procedure.

Ordinarily, "an adverse inference instruction based on the destruction of evidence" need only "establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). Judge Lindsay found that Dominique had both control and a duty to preserve; a "culpable state of mind" means (in this context) nothing more than negligence; and the lost messages were surely at least "relevant" to Dorn's claims. *Id.* Given these facts, an adverse inference would seem to be a layup.

But adverse inferences based on spoliation of ESI—like the texts and emails at issue here—are not governed by this general, common-law rule; they're instead governed by a specific provision of the Federal Rules of Civil Procedure. *Bruin v. Swank*, 2025 WL 289679, at *7 (W.D. Ky. Jan. 24, 2025). Subdivision (e)(1) of Rule 37 affords a trial judge considerable flexibility to craft appropriate sanctions "upon finding prejudice to another party from loss of" "electronically stored information that should have been preserved." But subdivision (e)(2) limits that remedial flexibility in an important way:

> (2) only upon finding that the [alleged spoliator] acted with the intent to deprive another party of the information's use in the litigation may [the court]:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C) dismiss the action or enter a default judgment.

4

FED. R. CIV. P. 37(e)(2). This departure from the common-law default rule, adopted in 2015, was a consequential one. As the Advisory Committee explained when it made the change, subdivision (e)(2) "limits the ability of courts to draw adverse inferences based on the loss of information …, permitting them only when a court finds that the information was lost with the intent to prevent its use in litigation." Advisory Committee Note to 2015 Amendment.

And under this rule, "[a] showing of negligence or even gross negligence will not do the trick." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016). Absent a finding of the "intent" demanded by Rule 37(e)(2), no "adverse inference instruction for spoliation of electronic information" is available. *Id.* "Were this any other type of evidence"—letters, say, rather than texts and emails—"the Court would have the ability to impose an adverse inference sanction." *Bruin*, 2025 WL 289679, at *9 n.12; *accord Arch Insurance Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 457–58 (6th Cir. 2012) (negligence sufficed for destruction of physical evidence). But the Rules Committee has seen fit to afford deleted text messages and emails heightened protection.

To his credit, Dorn acknowledges this limitation. *See* Motion to Set Aside at 8, 18. But he offers no evidence of intent to overcome it. He instead asks the Court to infer intent from "the timing of the deletion of the data" and Dominique's lack of a "credible explanation for the failure to preserve." *Id.* at 19. Neither ground has been shown. As to timing, Judge Lindsay found that Dominique bore a duty to preserve his texts since at least 2017. Yet by Dorn's account, Dominique didn't lose any texts until he bought a new phone in 2019—two years into this multijurisdictional saga. *See id.* at 19. And as for emails, Dorn likewise asserts that Dominique has followed his deletion "policy" since he began to use it. *See* Motion for Sanctions at 13. Dominique's approach to document preservation may well have been negligent. But nothing about the timing supports an inference of intent.

The mere fact that Dominique lost ESI, moreover, doesn't prove he *intended* to shed those messages to avoid their discovery by Dorn; the conduct and the mental state are two distinct elements. Yet nothing but this conjecture undercuts Dominique's explanation for how he lost the ESI. *See* Motion to Set Aside at 18–20. Without any evidence to the contrary, the Court will not conjure its own reasons to doubt Dominique's reasonable (if negligent) explanations: that he bought a new phone years after litigation had begun and has always deleted emails when his inbox gets full. So the Court finds that Dominique's loss of ESI was at most negligent and that an adverse inference is therefore unavailable.

This lack of intent does not, however, rule out other, lesser sanctions that a court may impose under subdivision (e)(1). On finding prejudice, a court "may" still "order measures no greater than necessary to cure the prejudice." FED. R. CIV. P.

5

37(e)(1). "Care must be taken … to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation." Advisory Committee Note to 2015 Amendment. But sanctions short of an adverse inference are appropriate only on a showing of prejudice.

Although Dorn adverts to this possibility by asking for attorney's fees, *see* Motion to Set Aside at 20, he does not make a full-throated argument for fees or any other fallback position. So the Court will allow Dorn, if he chooses, to file a new motion or another appropriate filing concerning the possibility of other sanctions that may yet be available under Rule 37(e)(1) given the adjudication of the summary-judgment motion.

### III. Summary Judgment

Dominique's motion focuses on just one required (and in his view, missing) element of Dorn's claims: causation. *See* Summary Judgment Motion (DN 50) at 16–19. As Dominique reads the record, no evidence indicates that anything he said actually influenced Tiller's decision to breach his contract with Dorn. And without evidence to allow a reasonable finding that Dominique induced Tiller's termination decision, Dorn can't get this case to a jury. So at this stage, everything comes down to causation—and causation comes down to what motivated Tiller.

Both of Dorn's tort claims require him to show causation. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. Ct. App. 2012) (tortious interference with contract and business advantage require improper interference that either "cause[d] a breach" of contract or "caus[ed]" harm to a "business relationship or expectancy"). And under Kentucky law, "the plaintiff has the burden to establish legal causation"; "speculation, supposition, or surmise" that the defendant might be at fault doesn't suffice. *Huffman v. SS. Mary & Elizabeth Hospital*, 475 S.W.2d 631, 633 (Ky. 1972).

"Generally, the existence of legal cause is a question of fact for the jury." *Bailey v. North American Refractories Co.*, 95 S.W.3d 868, 872 (Ky. Ct. App. 2001); *accord Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) ("Under Kentucky law, causation is generally a question of fact for the jury."). And it "only becomes a question of law for the Court where the facts are undisputed and are susceptible of but one inference." *Bailey*, 95 S.W.3d at 872. So long as "the inference of causation is reasonable," the issue goes to the jury. *Martin*, 561 F.3d at 443.

Direct evidence isn't required to establish a reasonable inference of causation, which "may be established by a quantum of circumstantial evidence" too. *Bailey*, 95 S.W.3d at 872–73 ("To find causation, the jury naturally draws inferences from circumstantial evidence.") (quotation marks omitted). That principle is particularly

6

important in a case, like this one, that turns upon someone's motives for acting. In most cases, of course, causation and motive are very different elements. But in a tortious-interference case, whether the alleged improper act caused the contract breach or business transgression that injured the plaintiff is a question of motivation. Here, Tiller's: Did he fire Dorn because of Dominique's interference or for other reasons? And it's hard to imagine answering most questions like this one without circumstantial evidence. As the Supreme Court has recognized in another context, "[o]utright admissions of impermissible … motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). For this reason, "state of mind is typically not a proper issue for resolution on summary judgment." *Wilson v. Seiter*, 893 F.2d 861, 866 (6th Cir. 1990), *rev'd on other grounds*, 501 U.S. 294 (1991); *see also* 10B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2730 & n.27 (4th ed., May 2025 update) (collecting cases applying this principle to tortious-interference disputes).

So why did Tiller fire Dorn? Record evidence could plausibly support a reasonable jury finding on either side of the question.

Dominique's motion points first to Tiller himself. Tiller swore that he didn't "rely on advice from … Dominique in terminating" his agreement with Dorn. 2018 Tiller Dep. at 152:24–153:1. Instead, Tiller says they parted ways because Dorn "had different views" about Tiller's career trajectory, *id.* at 141:22, needed to "[p]arty less," *id.* at 142:13, and was "ruining some of [Tiller's] relationships … with Drake, OVO, [and] other people," *id.* at 142:13–16. *See also id.* at 147:6–20 ("[H]e's always concerned about getting sex with girls … and stuff like that."). And Tiller adds that he warned Dorn of these issues in advance, telling him to "stop bringing … girls around" and stop wearing a chain bearing the logo of OVO Sound (a record label whose premature embrace could've limited Tiller's leverage). 2020 Bryson Tiller Deposition (DN 50-2) at 415:3–8 (girls); 2018 Tiller Dep. at 144:21–145:24 (chain). Dominique also cites Ryan Cox, Tiller's then-roommate, who corroborated Tiller's story that Dorn's antics and girls were "part of the reasoning" behind Dorn's firing. Ryan Cox Deposition (DN 50-12) at 150:10–152:2.

Dorn's response cites other record evidence to counter that narrative. Was Tiller's aversion to sex, drugs, and hip-hop intrigue really the reason he ran into the arms of a manager like Dominique? Cox's testimony offers at least some reason to suspect not. Tiller "himself" also "[brought] girls to the studio" and "wasn't that upset about" Dorn's doing so. *Id.* at 150:24–151:1. And Cox said that partying and the "OVO issue" were not "all of" Tiller's reason for firing Dorn. *Id.* at 150:10–18. Dorn says the same: Tiller, too, had "[s]everal girls … [whom] he was hooking up with" at the house. Deposition of Steven Dorn (DN 62-3) at 11:1–7. And Dorn swears that Tiller never asked him to stop his own parallel pursuits. *Id.* at 128:16–23. "In the hundreds of messages between Tiller and Dorn" that *were* produced, moreover,

7

"Dorn's alleged partying was never raised as a criticism or even an issue." Response to Motion to Dismiss at 22. On the contrary, the texts (DN 62-18) seem to corroborate that to the extent Dorn partied, Tiller joined with enthusiasm. *See, e.g., id.* at 13–14, 26 (girls); *id.* at 51 ("STD scare"); 18, 48, 64, 81, (drugs). Plus, when pressed during deposition, Tiller couldn't recall any specific instances where Dorn's alleged antics interfered with his work or gave him reason not to trust Dorn. *See* 2020 Tiller Dep. at 400:20–23.

Dorn also points to aspects of his work with Tiller from which a reasonable jury could infer that Dorn, not Tiller, is telling the truth. Dorn testified that he was "working hard," "generating promising connections and leads," making "direct revenue," and helping forge the RCA deal that Tiller eventually signed. Response to Motion for Summary Judgment at 19, 4–5 (collecting record citations). This seemingly uncontested evidence bears out that narrative: while Dorn managed Tiller (and paid his bills), Tiller forged relationships with industry heavyweights, recorded his breakthrough single, and cut his first record deal (involving the RCA A&R Dorn had introduced to Tiller). 2017 Dorn Dep. at 77:2–18; Tiller Deposition Excerpt (DN 62-1) at 254:15–255:7; Dorn Affidavit (DN 62-4) ¶¶ 7, 15; RCA Contract (DN 62-15). And through all this, Dorn adds, Tiller never once told him that problems loomed on the horizon. 2020 Dorn Dep. at 128:16–23; Dorn Aff. ¶ 14 ("I really never had any issues with Tiller until [Dominique] … became involved. Not once did Tiller accuse me of acting unprofessionally during our relationship."); *see also* 2018 Tiller Deposition Excerpt (DN 62-6) at 179:2–14.

Other testimony in the record undermines Dominique's position that his remarks to Tiller didn't relate to Dorn's firing. Ryan Cox testified that he overheard a February 2015 phone call in which Dominique told Tiller "that Dorn didn't have music industry experience, that no one in the business liked Dorn[,] and that Dorn was holding Tiller's career back." Cox Dep. at 132:23–134:12; *see also* Ryan Cox Affidavit (DN 8-2) ¶ 10. At that point, Cox says, Tiller began to talk about Dorn "getting X'd out." *Id.* at 175:11. And soon after that, Tiller demoted Dorn and then fired him altogether. This, too, raises a credibility question. Dominique's testimony flatly contradicts Cox's: he says he never criticized Dorn to Tiller and instead wanted Dorn to remain on the team. 2024 Deposition of Neil Dominique (DN 50-6) at 102:19–23, 101:2–3, 101:17–20.

But if a jury doubted Tiller's explanation and believed Cox's description of the phone call, then it could well infer that Dominique's statements caused the demotion and firing soon after.

True enough, as Dominique points out, a plaintiff may not avoid summary judgment by filing only a self-serving affidavit. But the decisions Dominique cites for this principle are more limited than he lets on. They stand for the proposition that

8

"a party cannot create a factual dispute by filing an affidavit, *after a motion for summary judgment has been made*, which *contradicts earlier testimony*." *Reich v. City of Elizabethtown*, 2018 WL 6028719, at *5 (W.D. Ky. Nov. 16, 2018) (emphasis added) (quoting *Dotson v. U.S. Postal Service*, 922 F.2d 976, 978 (6th Cir. 1992) (per curiam)); *accord U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998); *Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003). If, by contrast, the new affidavit doesn't contradict the affiant's earlier testimony or "interject factual assertions not disclosed during discovery," then it doesn't pose this problem. *Reich*, 2018 WL 6028719, at *5. Dorn's testimony does neither.

And more importantly, Dorn's testimony is not merely self-serving (in the sense of being unsupported by other record evidence). Cox's testimony, suspicious timing, and the undisputed facts about Tiller's success during his time with Dorn are all consistent with Dorn's story that Dominique's whispers induced Tiller's termination decision. And the caselaw Dominique cites doesn't establish the proposition that a plaintiff may not rely on his or her own deposition or affidavit to avoid summary judgment.

Nor is it clear why Tiller's testimony is any less self-serving than Dorn's. Their dueling accounts claim support from differing parts of the record—and it's not hard to imagine a jury reasonably believing either story in preference to the other. Given this classic credibility battle, the Court has no basis to preempt a jury's decision.

Resisting this conclusion, Dominique points to a line from the Kentucky Supreme Court, later quoted by the Sixth Circuit, that sending causation to a jury is appropriate only when the evidence "indicate[s] the *probable*, as distinguished from a *possible* cause." *Martin*, 561 F.3d at 443 (quoting *Huffman*, 475 S.W.2d at 633).

Does this line alter the typical "reasonable jury by a preponderance" standard? Although Kentucky courts have relied on *Huffman*'s description of the causation standard in various contexts, *see, e.g.*, *Boland-Maloney Lumber Co. v. Burnett*, 302 S.W.3d 680, 687 (Ky. Ct. App. 2009); *Estate of Jones v. Process Machinery, Inc.*, 2015 WL 7573942, at *4 (Ky. Ct. App. Nov. 25, 2015); *Arlie Larimer & Sons, Inc. v. Kleen-Leen, Inc.*, 523 F.2d 865, 869 (6th Cir. 1975) (collecting cases), *Huffman* itself was—and derived its key language from—products-liability decisions. *See* 475 S.W.2d at 633 (question whether blood impurities or else "needle or blood-letting device" caused "serum hepatitis"); *Briner v. General Motors Corp.*, 461 S.W.2d 99, 101 (Ky. 1970) (question whether manufacturer, repairer, or some external factor caused car breakdown). In cases like these, it makes little sense to send a case to a jury without evidence from which the jury could conclude that one of many possible explanations for an accident is the most probable. *See, e.g.*, *Sutton's Administrator v. Louisville & Nashville Railroad Co.*, 181 S.W. 938, 940 (Ky. 1916) ("It is not sufficient … to present

9

a number of circumstances about which one might theorize as to the cause of the accident.") (cited in *Briner*).

That context makes clear why this situation is different. Here, the all-important question of causation doesn't require jurors to speculate, without any reasoned basis for differentiation, about which of several items caused a consequence. Instead, it turns on which account—told in court, under oath, subject to cross-examination—the jury finds most credible. In other words—standard jury fare. And when it comes to human motivation, evidence of possibility is no different in kind than evidence of probability. Tiller testifies that his reasons were Dorn's partying and incompatible artistic vision; Dorn testifies that Tiller's reasons depended on Dominique's bad-mouthing despite a successful collaborative relationship. This contradictory testimony requires a jury to decide—based on testimonial, documentary, and circumstantial evidence, not mere speculation—which of two men is telling the truth.

And whether this evidence shows probability (and thus meets the preponderance-of-the-evidence standard) or just possibility (and thus does not) is a question of *weight*, not *kind*. Even in the context of a criminal conviction, requiring proof beyond a reasonable doubt, "it is black letter law that testimony of a single eyewitness suffices … even if 20 bishops testify that the eyewitness is a liar." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). Those weight and credibility judgments are for the jury to make at trial, not a judge to make on summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). All the more when a jury need only find causation more likely than not—and when the witnesses are two former friends with an incentive to twist the truth.

It would be different, of course, if Dorn had no evidence from which the jury "coul[d] disbelieve the defendant's denial." *Id.* at 256. But here, the timing and content of the phone call Cox overheard, Tiller's reaction to the phone call, and the documentary and testimonial evidence undercutting Tiller's proffered alternative explanations would allow the jury to find Tiller incredible. That's a genuine issue for trial.

Under Rule 56, in any event, the question before the Court is whether there is a genuine issue for trial as a matter of the federal procedural law governing summary judgment. "Any proof or evidentiary requirements imposed by [state] substantive law are not germane to this inquiry." *Liberty Lobby*, 477 U.S. at 248. So even assuming Kentucky law imposes a higher bar at summary judgment than does federal law, the Court would be obligated to apply the federal standard. And under that standard, this case cannot be resolved by summary judgment before trial.

10

## ORDER

The Court denies Dorn's motion to set aside the Magistrate Judge's sanctions order (DN 87) and denies Dominique's motion for summary judgment (DN 50). Should Dorn wish to move for sanctions other than an adverse inference, he may file a new motion to set aside the Magistrate Judge's sanctions order within 30 days of this order. If he does, Dominique may respond within 21 days.

Benjamin Beaton, District Judge
United States District Court

September 30, 2025