# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION
*Electronically Filed*

| | | |
|---|---|---|
| **STEVEN J. DORN** | ) | |
| | ) | Civil Action No. 3:20-cv-118-BJB |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **NEIL S. DOMINIQUE** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DOMINIQUE'S MOTION FOR SUMMARY JUDGMENT ON AGENCY GROUNDS

Defendant Neil S. Dominique, by and through counsel, and for his Motion for Summary Judgment on Agency Grounds states as follows:

## INTRODUCTION

Plaintiff Steven J. Dorn alleges that Dominique tortiously interfered with his relationship with Bryson Tiller. But Dorn admits that Tiller hired Dominique and Dominique was serving as Tiller's co-manager at the time the alleged interference occurred. (Dorn Affidavit, DE 62-4, Para. 12-13). Further, Dominique's supposed wrongful conduct – Dominique purportedly telling Tiller that he believed Dorn lacked experience and was holding back Tiller's career, falls squarely within Dominique's duties as a manager to advise and consult with Tiller on all aspects of his career. (Cox Depo., 132:23-137:22, Ex. 1); (Opinion & Order, DE 104, 8-10).

Agents like Dominique acting within the scope of their agency relationship cannot, as a matter law, be held liable for interfering with their principals' contracts or business relationships. E.g., *Harstad v. Whiteman*, 338 S.W.3d 804, 814 (Ky. App. 2011). Since Dominique was Tiller's agent and the alleged wrongful conduct Dorn complains of falls within the scope of that agency

relationship, Dominique, as a matter of law, cannot be held liable for Dorn's tortious interference claims. As a result, summary judgment should be granted dismissing Dorn's claims with prejudice.[1]

## BACKGROUND

Dorn and Tiller entered into a Management Agreement effective October 14, 2014 on or about January 3, 2015. (Management Agreement, DE 8-1). As Tiller's manager, Dorn agreed to take on the duties typical of any artist manager including taking actions to "promote, develop and advance" Tiller's entertainment career, "negotiate, counsel and confer" with individuals desirous of engaging Tiller, and generally provide advice on "all matters related to his career" and concerning "all professional matters." (Id. at Para. 1).

But Dorn was green. He admits he was "just getting started in the music business" and was a "relative unknown in terms of music management," making it difficult for him to provide competent managerial services. (Dorn Affidavit, DE 62-4, Para. 4). Tiller and his longtime advisor Rich Gretah recognized that Dorn's lack of experience was a problem. (E.g., Tiller 2020 Depo., 267:13-268:3, Ex. 2). And, according to Tiller, it was Gretah that told Tiller to hire Dominique based on his experience and connections in the music industry. (Id. at 266:2-19). Tiller testified unequivocally that he ultimately made the decision to hire Dominique in March 2015 because Dominique had the experience that Dorn lacked. (E.g., Id. at 267:13-268:3) (Tiller "wanted [Dominique] to be a part of the team" and hired him because "Steve [Dorn] didn't have much

---

[1] Dominique previously raised agency as a reason Dorn's claims fail at the motion to dismiss stage. E.g., (Renewed Motion to Dismiss, DE 27). Ultimately, the Court denied the motion without ruling on the merits of the agency argument, indicating that the Parties could revisit the issue following discovery at summary judgment. (Text Order Denying Renewed Motion to Dismiss. DE 33). As fact discovery has now concluded, Dominique submits that the matter is now ripe for determination.

2

experience in the music industry and [Tiller] just wanted to be safe with [his] career"); (Dorn Affidavit, DE 62-4, Para. 12).

Dorn cannot dispute any of this. He has acknowledged that it was Gretah who advised Tiller to hire Dominique as a co-manager. (Dorn 2017 Depo., 91:12-92:4, 94:18-95:11, Ex. 3). And Dorn "recognized Dominique's value on the music side of things" based on his industry experience. (Dorn Affidavit, DE 62-4, Para. 4); *accord* (Dominique 2020 Depo., 38:22-40:24, Ex. 4) ("Q. So Steven Dorn and Bryson Tiller together explained that they thought your experience would be helpful to Bryson Tiller's career; is that correct? A. Correct."). Dorn concedes that Dominique was hired as a co-manager in March 2015. (Dorn Affidavit, DE 62-4, Para. 12-13).

Upon his hiring, given his music industry experience, Dominique became a counselor and advisor for Tiller in his role as co-manager. (Dorn 2018 Depo., 53:4-22, 71:5-13, Ex. 5) (Dorn stating that Tiller consulted with, among others, Dominique on matters related to his career and "John Ingram, Neil Dominique, myself, and Bryson talked about pretty much everything together"); (Dorn 2025 Depo., 16:5-17:3, Ex. 6) (testifying that providing advice and opinions on how to advance an artist's career and what individuals they should and should not work with all fall within the scope of a manager's obligations); (Dominique 2024 Depo., 93:9-95:23, Ex. 7) (Dorn and Tiller would "look to [Dominique] for advice, what do I think about this, what do I think about that"; Dominique was "considered to be a co-manager of Mr. Tiller as soon as [he] started doing work for [Tiller] in March of 2015"); (Tiller 2020 Depo., 267:13-25, 268:10-269:9, Ex. 2) (Dominique was to act as a manager and Tiller wanted him to "do most of the talking" on Tiller's behalf); (Draft Co-Management Agreement, Para. 3, Ex. 8) (setting out that Dominique, as co-manager, "shall confer with, counsel and advise Artist in all matters pertaining to Artist's career in the entertainment industry"); *accord* (Dorn 2017 Depo., 95:15-23, Ex. 3) (Dorn noting

3

that Dominique set up sessions with producers, would attend meetings, and communicate with others); (Tiller 2018 Depo., 90:17-91:4, Ex. 9) (Dominique was brought on because Dorn "didn't have too much experience with the music industry").

The crux of Dorn's case, however, is that he does not like a particular piece of advice Dominique is alleged to have ultimately provided to Tiller following his hiring, and the advice provided by Dominique influenced Tiller to fire Dorn. Dorn's claim of tortious interference centers on his claim that his longtime friend Ryan Cox overheard Dominique telling Tiller on a phone call that in Dominique's opinion Dorn "didn't have music industry experience, that no one in the business liked Dorn, and that Dorn was holding Tiller's career back." (Cox Affidavit, DE 8-2, Para. 16); (Cox Depo., 132:7-137:23, Ex. 1). Cox testified that the purported conversation "probably [occurred] sometime in May or June 2015," well after Dominique was hired as a co-manager in March 2015.[2] (Id. at 137:14-22).

---

[2] Cox's testimony about when that call allegedly occurred is found on Page 137 of the transcript of his deposition when he confirmed that the conversation described in Paragraph 16 of his affidavit occurred "probably sometime in May or June" 2015. (Cox Depo., 137:14-22, Ex. 1). Paragraph 16 of Cox's affidavit is the paragraph that states: "In one of those [phone] conversations I recall Mr. Dominique telling Tiller that Dorn didn't have music industry experience, that no one in the business liked Dorn, and that Dorn was holding Tiller's career back." (Cox Affidavit, DE 8-2, Para. 16). Paragraph 16 does not date this conversation, but Cox was able to place the call in May or June 2015 during his deposition because he claimed that: (1) it took place *after* a separate conversation he allegedly overheard between Tiller and John Ingram, which occurred in March or April 2015 and is referenced in Paragraph 17 of the affidavit; and (2) it occurred "close to the time that Mr. Tiller terminated [Dorn's] management agreement" in June 2015. (Cox Depo., 136:14-22, Ex. 1).

This conversation that Cox alleges he overheard between Dominique and Tiller served as the basis for the Court's decision to allow this matter to proceed past Dominique's motion for summary judgment on the issue of causation. (Opinion & Order, DE 104, pp. 8-10). In its Opinion & Order, the Court noted that Cox testified he overheard this discussion in February 2015. (Opinion & Order, DE 104, p. 8) (citing Cox Depo. at 132:23-134:12; Ryan Cox Affidavit (DN 8-2 ¶ 10)). Based on the foregoing, Dominique respectfully submits that the Court appears to have confused the at issue phone call with a separate call involving John Ingram, Dorn, and Tiller that was alleged to have taken place in February 2015. While Cox's affidavit does, as the Court noted, cite a specific February 2015 call in Paragraph 10, that call involved "Tiller, Dorn, and a California attorney named John Ingram where Tiller and Dorn decided to hire Ingram to help with their business". (Cox Affidavit, DE 8-2, Para. 10); (Cox Depo., 114:15-116:16, Ex. 1). In other words, the February 2015 call in Paragraph 10 of Cox's Affidavit is separate from both: (1) the call where Cox purportedly overheard Dominique provide negative opinions about Dorn to Tiller in May or June 2015; and (2) the other call between Ingram and Tiller in March or April 2015, which Cox used to date the Dominique-Tiller call in dispute to later on in May or June 2015.

4

None of these allegations are true,[3] but as even Dorn has admitted, when asked expressly what an artist's manager is supposed to do, providing advice and opinions just like this on advancement of an artist's career and what people the artist should, *and should not*, work with, falls squarely within the roles and responsibilities of a manager:

> Q. Okay. So just kind of tell me generally when you are acting as a manager for somebody in the music industry, what do you do?
>
> A. I set up meetings, market the music, find producers, you find opportunities for them, really anything and everything to advance their career as an artist.
>
> Q. Do you give them advice on how to advance their careers?
>
> A. Yes, that too.
>
> Q. And, when I say advice, do you understand that to mean, you know, giving your opinion as to which direction, which contract, which people would be best for them?
>
> A. Yeah, like what label to sign with or, you know, what publishing company to sign with, what producers to work with. Along those lines.
>
> Q. Do you ever give them advice on hiring other individuals that might work for them?
>
> A. Maybe a videographer or a marketing company.
>
> Q. What about like a booking agent. Would you ever give them advice on hiring a booking agent?
>
> A. Yeah, that is one of the things that, you know, we would discuss as a team, a booking agent to sign with.
>
> Q. So all of those different things that you just mentioned that were related to career, producers, booking agents, videographers – all of those things, as a manager, you believe that is within your scope to give that individual advice on those things. Right?

---

[3] Dominique never made these statements and in fact testified that it was in his interest for Dorn to stay on as co-manager, given that Dominique already had a full time job at Revolt TV at the time. (Dominique 2024 Depo., 101:2-18, 102:3-6, 104:6-16, Ex. 7). Further, Cox's testimony is belied by the fact that in April and May 2015, just before these statements were allegedly made, Dominique was trying to negotiate an arrangement through which Dorn would actually receive greater compensation from Tiller for his role than what is provided under the Management Agreement – 15% of Tiller's *gross* earnings as opposed to 20% of his net earnings as provided under the Management Agreement. *Compare,* Management Agreement, DE 8-1, Para. 3(a), *with* Draft Management Agreement, Para. 5(a), Ex. 8.

    A. Yes.

(Dorn 2025 Depo., 15:23-17:3, Ex. 6); *accord* (Tiller 2018 Depo., 97:17-25, Ex. 9) (Dominique advised on Tiller's decision to hire an individual with CAA as his talent agent as well).

    As a result, even if Dominique did offer the opinions and advice alleged, providing such opinions and advice falls squarely within the scope of Dominique's agency of Tiller. This means that Dominique's claimed actions cannot, as a matter of law, serve as the basis of a tortious interference claim.[4]

## **LEGAL STANDARD**

    "Summary judgment is proper when, construing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in the nonmovant's favor, there 'is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 602 (6th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). Once a movant meets its burden by showing that "there is an absence of evidence to support the nonmoving party's case," the nonmovant must "produce admissible evidence to create a genuine

---

[4] Dorn has failed to offer a single other *concrete* action that he contends that Dominique took in order to interfere with his relationship with Tiller. In the affidavit submitted in response to Dominique's motion for summary judgment on the issue of causation, Dorn claimed "Dominique was constantly questioning my every move," but failed to ever articulate what specifically Dominique is purported to have actually said or done that was critical of him other than the purported conversation overheard by Cox. (DE 62-4, Para. 14). Further, Dorn admits that the "criticism," i.e. the offering of opinions - which is what Dominique and Dorn were both hired to do as managers - would have nevertheless occurred after Dominique was made part of the management team. (Id. at Paras. 13-14). While Dorn also initially alleged in his First Amended Complaint that he speculated that Dominique was behind rumors getting to Tiller that Dorn was misleadingly suggesting to individuals in the industry that Tiller intended to sign with the record label OVO, instead of RCA, in order to start some sort of bidding war, Dorn's supposition on this matter has been entirely refuted by the record, which makes clear that it was a member of the OVO team that told Tiller that someone on his team was spreading those rumors. (DE 8, Paras. 52-54); (Tiller 2020 Depo., 380:16-24, 381:11-25, 383:1-17, 384:8-386:24, 387:14-389:24, Ex. 2); (Tiller 2018 Depo., 144:21-145:21, Ex. 9). Thus, the only concrete action by Dominique that Dorn can remotely point to in order to claim wrongful interference with his relationship, is the conversation purportedly overheard by Cox, which would have been made in the course and scope of Dominique's agency with Tiller.

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Wilson v. Ohio Dep't of Job & Family Servs.*, 178 F. App'x 457, 463 (6th Cir. 2006).

## ARGUMENT

Dorn's tortious interference with a contract and tortious interference with a prospective business advantage claims both require him to establish "wrongful" or "improper" conduct without justification. *See, e.g., Sparkman v. Consol Energy, Inc.,* 571 S.W.3d 569, 571-72 (Ky. 2019); *Nat'l Collegiate Athletic Ass'n v. Hornung,* 754 S.W.2d 855, 857-58 (Ky. 1988); *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC,* 182 S.W.3d 529, 533-34 (Ky. App. 2005); *see also* Restatement (Second) of Torts §§ 766, 766A, 766B.

These torts also require that such conduct be taken "by a third party" to the business relationship at issue. *Harstad v. Whiteman*, 338 S.W.3d 804, 814 (Ky. App. 2011); *accord Brown & Brown of Ky., Inc. v. Walker*, 652 S.W.3d 624, 640-41 (Ky. App. 2022). Parties to a contract cannot interfere with their own contract, and by extension, agents acting within the scope of their agency relationship are not third parties that can tortiously interfere with their principals' business relationships. *Harstad,* 338 S.W.3d at 814 (citing *Carmichael-Lynch-Nolan Advertising Agency, Inc. v. Bennett & Assocs., Inc.,* 561 S.W.2d 99, 102 (Ky. Ct. App. 1977)); *Hackney v. Lincoln Nat'l Fire Ins. Co.,* 657 Fed. App'x 563, 577 (6th Cir. 2016)*; Watts v. Lyon Cnty. Ambulance Serv.,* 23 F. Supp. 3d 792, 812-13 (W.D. Ky. 2014); *Gray v. Wal-Mart Stores, Inc.,* No. 3:11-CV-367-H, 2012 U.S. Dist. LEXIS 133213 at *15-16 (W.D. Ky. Sept. 17, 2012); *Smith v. Caterpillar, Inc.,* No. 05-436-JBC, 2007 U.S. Dist. LEXIS 1532, at *11 (E.D. Ky. Jan. 8, 2007); *Leary v. Daeschner*, 186 F. Supp. 2d 774, 777 (W.D. Ky. 2001); *Ebbs v. Roty,* NO. 2020-CA-1121-MR, 2022 Ky. App. Unpub. LEXIS 573, at *9 n. 2 (Ky. App. Oct. 7, 2022); *accord Hannah v. Mullins Family Funeral*

7

*Home LLC*, No. 2:20-cv-00617, 2021 U.S. Dist. LEXIS 181504, at *18-19 (S.D. W. Va. Sept. 13, 2021) (applying Kentucky law).

Dorn cannot establish the requisite third-party conduct in this matter because there is no genuine dispute that the actions allegedly taken by Dominique would have been taken while he was serving as Tiller's agent and the actions alleged would have fallen within the scope of that agency relationship.

### I. Dominique was an Agent of Tiller at the Time of the Conduct Alleged to be at the Heart of His Claims.

There is no genuine dispute that the purportedly improper actions taken by Dominique occurred after Dominique became Tiller's agent.

An agency relationship arises when the principal manifests assent for the agent to act on his behalf and the agent consents. *E.g.*, *Ditto v. Mucker*, 663 S.W.3d 456, 460 (Ky. App. 2022); *Laurel Creek Health Care Ctr. v. Colson,* NO. 2009-CA-001055-MR, 2010 Ky. App. Unpub. LEXIS 233, at *4-5 (Ky. App. Mar. 19, 2010); *accord* Restatement (Third) of Agency §§ 1.01, 2.01 (2006). Here, Tiller made the decision to hire Dominique. (E.g., Tiller 2020 Depo., 267:13-268:3, Ex. 2); (Dorn Affidavit, DE 62-4, Para. 12). Dominique accepted a position on Tiller's team as Tiller's co-manager. (Tiller 2020 Depo., 268:10-18, Ex. 2); (Dominique 2024 Depo., 95:20-23, Ex. 7); (Dorn 2017 Depo., 94:18-95:14 Ex. 3). And Dorn agrees that Tiller hired Dominique for that position in March 2015. (Dorn Affidavit, DE 62-4, Paras. 12-13).

Dorn has conceded that the actions he claims Dominique took to interfere with his relationship with Tiller took place *after* Tiller hired Dominique and Dominique became Tiller's agent in March 2015. *See* (Id. at Paras. 14, 16). Specifically, the conversation between Tiller and Dominique that Ryan Cox allegedly overheard, and which is the crux of Dorn's claim of wrongful conduct, is alleged to have taken place in May or June 2015 according to Cox. (Cox Depo., 137:14-

8

22, Ex. 1); (Opinion & Order, DE 104, pp. 8-10) (holding that the purported conversation is what allows Dorn to survive summary judgment on the causation issue). As such, there can be no reasonable dispute that Dominique's alleged misconduct, which serves as the basis of Dorn's claims, occurred *after* Dominique had already been hired as Tiller's agent.

## II. Summary Judgment is Appropriate Because Dominique's Alleged Misconduct Fell Within the Scope of His Agency Relationship with Tiller.

Dominique's allegedly wrongful conduct also falls squarely within the scope of his agency relationship with Tiller.

The conversation that Dorn's friend Cox contends he overheard, and which is at the heart of Dorn's claims, consisted of Dominique offering his opinion and advice that "Dorn didn't have much music industry experience, that no one in the business liked Dorn, and that Dorn was holding Tiller's career back." (Cox Affidavit, DE 8-2, Para. 16). Irrespective of whether that conversation actually occurred, as even Dorn has acknowledged, providing advice and opinions on how to advance an artist's career, including advice and opinions as to who they should and should not work with, is precisely what a manager like Dominique is supposed to do in that position. (Dorn 2025 Depo., 15:23-17:3, Ex. 6); *see also* (Management Agreement, DE 8-1, at Para. 1) (setting out managerial duties including providing advice in all matters related to Tiller's entertainment career); (Draft Co-Management Agreement, Para. 3, Ex. 8) (holding that Dominique, as co-manager, "shall confer with, counsel and advise Artist in all matters pertaining to Artist's career in the entertainment industry").

This is in accord with the entertainment industry and the judiciary's perception of what an artist's manager is supposed to do as well. *Cagle v. Hybner,* No. M2006-02073-COA-R3-CV, 2008 Tenn. App. LEXIS 389, at *18-19 (Tenn. App. July 3, 2008) ("the artist-personal manager relationship is one of principal-agent due to the fact 'that the artist hires the manager to develop

9

and promote the artist's career, the manager agrees to use his special knowledge and experience in the entertainment industry on the artist's behalf, and the artist has the ultimate authority to ratify the manager's decisions'") (quoting Hal I. Gilenson, Badlands: Artist-Personal Manager Conflicts of Interest in the Music Industry, 9 Cardozo Arts & Ent. L.J. 501, 519 (1991)); 8 Entertainment Industry Contracts P. 147.01 (2020) ("The personal manager's primary role is to advise, counsel, and guide the artist with respect to development of the artist's career.").

Indeed, Dominique was brought on to help advise and counsel Tiller because there was such a concern that Dorn could not himself competently carry out that obligation given his lack of experience in the music industry. (E.g., Tiller 2020 Depo., 266:2-19, 267:13-269:9, Ex. 2); (Dorn Affidavit, DE 62-4, Para. 12); (Dorn 2018 Depo., 53:4-22, 71:5-13, Ex. 5); (Dominique 2024 Depo., 93:9-95:23, Ex. 7); (Tiller 2018 Depo., 90:17-91:4, Ex. 9).

Because Dorn's allegations that Dominique provided Tiller with advice and opinions as to Dorn's experience and whether Dorn was hindering Tiller's career fall within the scope of Dominique's duties as Tiller's agent to advise and guide his principal on all aspects of his career, they cannot, as a matter of law, serve as the basis for a tortious interference claim. *See, e.g., Harstad*, 338 S.W.3d at 814 (college employees' statements about faculty member's violation of the college's rules were not tortious interference); *Wilson v. St. Luke's Reg'l Med. Ctr., Ltd.*, No. 1:13-cv-00122-BLW, 2014 U.S. Dist. LEXIS 175264, at *3-4, 30-32 (D. Idaho Dec. 16, 2014) (defendant hospital employees who criticized fellow employee's conduct, which "jeopardized . . . business relations" with a doctor, to supervisors did not tortiously interfere with her hospital employment); *see also* Restatement (Second) of Torts § 772 ("advice within the scope of a request for the advice" cannot be improper interference); *York v. Lutz*, No. 2:22-CV-38-BO-BM, 2025 U.S. Dist. LEXIS 189031, at *8-10 (E.D.N.C. Sept. 24, 2025) (granting summary judgment in

favor of defendant who criticized plaintiff before plaintiff's termination and took plaintiff's position after her termination because defendant merely expressed an "opinion about the leadership and work product of another in the workplace"); *Cutting Edge Homes, Inc. v. Mayer*, 229 N.E.3d 613 (Mass. App. 2024) (architect hired by family to provide advice and review contractor's billing did not tortiously interfere where architect's criticism of contractor's billing practices "fulfill[ed] his professional obligation consistent with the [family's] wishes"). As a result, summary judgment should be entered dismissing Dorn's claims with prejudice.[5]

## **CONCLUSION**

WHEREFORE, for the reasons stated above, Dominique requests that summary judgment be granted in his favor.

                                         Respectfully submitted,

                                         */s/ Grahmn N. Morgan*
                                         Grahmn N. Morgan (KBA #89219)
                                         Kristeena L. Johnson (KBA #94994)
                                         James M. McClure (KBA #99580)
                                         Dinsmore & Shohl LLP
                                         City Center
                                         100 W. Main St., Ste. 900
                                         Lexington, KY 40507
                                         Telephone: (859) 425-1000
                                         Fax: (859) 425-1099
                                         grahmn.morgan@dinsmore.com
                                         kristeena.johnson@dinsmore.com
                                         mac.mcclure@dinsmore.com
                                         *Counsel for Defendant Neil Dominique*

---

[5] Notably, Dorn previously tried to sue Tiller's former entertainment counsel, John Ingram, as well, alleging that Ingram, as opposed to Dominique, was the cause of his termination because he contended that Ingram was the person that actually advised Tiller to terminate Dorn. However, the Los Angeles Superior Court granted summary judgment dismissing Dorn's claims because it found that Ingram too, as Tiller's counsel, would have been acting in the course and scope of his agency relationship in providing such advice. (Feb. 22, 2019 Order, Ex. 10).

## **CERTIFICATE OF SERVICE**

   This is to certify that on October 27, 2025, I electronically filed the foregoing through the Court's CM/ECF system, which will send a copy of the same to all counsel of record.

                /s/ Grahmn N. Morgan
                *Counsel for Defendant Neil Dominique*