**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:20-CV-00118-BJB-CHL**

**STEVEN J. DORN,** **Plaintiff,**

**v.**

**NEIL S. DOMINIQUE,** **Defendant.**

**MEMORANDUM OPINION AND ORDER**

Before the Court are two Motions for Sanctions filed by Defendant Neil S. Dominique ("Defendant"). (DNs 114, 115.) Plaintiff Steven J. Dorn ("Plaintiff") has filed Responses to both Motions. (DNs 125, 126.) Defendant has filed a consolidated Reply addressing both. (DN 135.) Plaintiff has also filed a Motion for Leave to File in Excess of Page Limits. (DN 144.) Judge Beaton has referred all Motions to the undersigned. (DN 138.)

## I. Background

This case involves allegations by Plaintiff that Defendant interfered with his contract with rhythm and blues artist Bryson Tiller ("Tiller"). The factual description herein is based on the allegations in Plaintiff's Amended Complaint. (DN 8.) Plaintiff specializes in representing and managing musicians and athletes in connection with their business affairs. (*Id.* at ¶ 13.) Plaintiff met Tiller sometime between late 2013 and early 2014, while Tiller was living in his car, before Tiller became an established R&B star. (*Id.* at ¶ 14.) Later in 2014, Tiller asked Plaintiff to be his exclusive business manager, and Plaintiff agreed. (*Id.* at ¶ 17.) In January of 2015, Plaintiff and Tiller entered into a written contract outlining the terms of Plaintiff's management relationship (the "Agreement"). (*Id.* at ¶ 22.) The Agreement provided that Plaintiff would receive 20% of all

net compensation Tiller received in exchange for Plaintiff using his best efforts to increase Tiller's earning capacity. (*Id.* at ¶ 23.)

In early 2015, Tiller began to attract attention from others in the music industry. (DN 8 at ¶ 27.) Big name record labels such as Interscope, Atlantic, Columbia, OVO Sound, and RCA Records all expressed interest in signing him. (*Id.*) Eventually, California entertainment attorney John Ingram ("Ingram") emailed Plaintiff a request to represent Tiller. (*Id.* at ¶ 30.) After a successful sales pitch, Tiller hired Ingram. (*Id.*)

When Tiller and Plaintiff were promoting Tiller's music in Miami, the two met with Rich Greta ("Greta"), a barber who cut hair for several people in the music industry. (DN 8 at ¶ 31.) Greta recommended that the two meet with Defendant, who at the time worked at ReVolt TV in Los Angeles. (*Id.*) Plaintiff intended to meet with Defendant to get Tiller's music videos played on the network. (*Id.*)

By the end of March 2015, Tiller told Plaintiff that Defendant would be serving as co-manager along with Defendant, and that Defendant would receive some of Plaintiff's commission. (DN 8 at ¶ 32.) The following month, Tiller was entertaining offers from RCA Records and OVO sound. (*Id.* at ¶ 33.) Eventually, Tiller accepted the offer from RCA. (*Id.* at ¶ 35.)

During this time, Tiller was living with Ryan Cox ("Cox"), a friend of Plaintiff's. (DN 8 at ¶ 36.) Cox often overheard Tiller's phone conversations, including one between Defendant and Tiller. (*Id.* at ¶¶ 35-40.) In this conversation, Defendant allegedly told Tiller that Plaintiff had no experience in the music industry, nobody in the business liked Plaintiff, and that Plaintiff was holding Tiller back. (*Id.* at ¶ 40.) Cox then told Plaintiff about this conversation the next time he spoke with him. (DN 115-4, at PageID # 3768.)

On June 15, 2015, Plaintiff received a group text from Ingram that included Defendant (the "June 15, 2015, text thread"). (DN 8 at ¶ 60.) Ingram told Plaintiff that Tiller wanted Plaintiff and Defendant to meet with Ingram. (*Id.*) But when Plaintiff arrived at Ingram's office, he discovered Defendant was not there. (*Id.* at ¶ 61.) At the meeting, Ingram told Plaintiff that Tiller was firing him, and that Tiller wanted nothing further to do with him. (*Id.*)

In July of 2015, Plaintiff requested that Tiller send him the cell phone Tiller had used while Plaintiff was Tiller's manager, and Tiller agreed. (DN 114-4.) The following year, Tiller sued Plaintiff, and Plaintiff countersued Tiller for defamation. (DN 81, at PageID # 2523.) Tiller alleged that between June and July of 2015, Tiller made several defamatory statements about Plaintiff such as: Plaintiff was a bad manager; Plaintiff did nothing to advance Tiller's career; Plaintiff was a distraction to Tiller; Plaintiff discouraged Tiller from composing music and instead to focus on partying; Plaintiff lied to members in the music industry about which label Tiller signed with; and Plaintiff had no interest in anybody's career but his own. (DN 114-1, at PageID # 3445.) However, the Fayette Circuit Court dismissed Plaintiff's counterclaims as a sanction for failing to comply with the court's discovery orders. (DN 114-3.) In 2020, Plaintiff filed this suit against Defendant.

Defendant has filed two Motions for Sanctions based on Plaintiff's alleged spoliation. Defendant alleges that Plaintiff deleted defamatory text messages sent by Tiller as well as the June 15, 2015, text thread, that Plaintiff destroyed Tiller's cell phone, and that Plaintiff and Cox collaborated to delete all relevant text messages.

## II. Discussion

If a party fails to take reasonable steps to preserve electronically stored information ("ESI") that should have been preserved in the anticipation or conduct of litigation, and it cannot be

restored or replaced through additional discovery, a court, upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice. Fed. R. Civ. P. 37(e)(1). Alternatively, a court may presume that the lost information was unfavorable to the party or instruct the jury that it may or must presume the information was unfavorable to the party only if the court finds that the party intended to deprive another party of the information's use in the litigation. Fed. R. Civ. P. 37(e)(2).

It is important to note that Defendant is asking for spoliation sanctions for Plaintiff's alleged destruction of Tiller's cell phone. (DN 114, at PageID # 3425.) Technically, cell phones are physical evidence, not ESI. Physical evidence is treated differently in a spoliation analysis; the Court has more discretion in fashioning appropriate sanctions for the destruction of physical evidence. *Contrast* Fed. R. Civ. P. 37(e)(2) ("[O]nly upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may [the court] … instruct the jury that it may or must presume the information was unfavorable to the party…") *with Beaven v. United States Dep't of Justice*, 622 F.3d 540, 555 (6th Cir. 2010) ("[The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference.") (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593-95 (4th Cir. 2001)). The Rules Committee has evidently decided to privilege this category of evidence above others because "[d]ue to the ever-increasing volume of electronically stored information and the multitude of devices that generate such information, perfection in preserving all relevant electronically stored information is often impossible." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Although Tiller's cell phone is physical evidence and thus would ordinarily be subject to common-law standards of spoliation and the Court's broad discretion, the Court will instead treat

it as if it were ESI. That is because Defendant's stated reason for seeking sanctions for the alleged spoliation of Tiller's cell phone is that "communications on that phone would have been relevant to rebut Dorn's newly raised argument that Tiller did not have any complaints or raise any concerns about Dorn's behavior and conduct leading up to his termination." (DN 114, at PageID # 3425.) In essence, what Defendant is *truly* seeking sanctions for is the loss of ESI stored on a physical device. Therefore, the Court will analyze the alleged loss of Tiller's cell phone under Rule 37(e). Applying any other rule would open the door for parties to circumvent the rigid requirements of Rule 37(e) and frustrate the stated goal of the Rules Committee in privileging ESI over physical evidence.[1]

### A. Defendant waived his right to seek relief under Rule 37(e) through unreasonable delay.

Plaintiff makes two arguments to persuade the Court that Defendant's Motions are procedurally improper. First, Plaintiff argues that Defendant has not complied with the Court's June 6, 2024, Scheduling Order's requirement that parties participate in a discovery conference with the Court before filing discovery motions. (DN 125, at PageID # 4183.) Second, Plaintiff argues that Defendant has waited an unreasonably long amount of time before seeking relief under Rule 37(e). (*Id.* at PageID # 4184.)

Regarding the first argument, the Court is unaware of any authority that clearly delineates what is a discovery motion and what is not a discovery motion. There are motions that fit into obvious categories; a motion for summary judgment is certainly not a discovery motion but a motion to compel certainly is. A motion for sanctions based on Rule 11 is also certainly not a discovery motion, but what about a motion for sanctions based on Rule 37(e)? What about a

[1] The Court has discretion to do this as well. Spoliation sanctions for the loss of physical evidence must be both fair and punitive. *Beaven*, 622 F.3d at 554. Therefore, the Court finds that applying Rule 37(e) in these circumstances is appropriate.

motion for sanctions based on the court's inherent power to sanction common-law spoliation? Do motions for sanctions become discovery motions solely because the conduct to be sanctioned relates to discovery? Without a clear answer, the Court will treat the motion before it as if it were not a discovery motion in order to maintain the parties' expectations. The Court did represent that it was not going to treat Defendant's Motion for Sanctions as a discovery motion, after all. *See* (DN 127, at PageID # 4713.) Moreover, the Court does not see how a telephonic discovery conference—the stated purpose of which is to explore possible compromise in lieu of motion practice (DN 38, at PageID # 462)—would be productive if Defendant is already seeking sanctions. The fact that a Party is requesting sanctions would suggest that the Parties are well past the point of compromise.

Second, the Court is unaware of any caselaw from the Sixth Circuit Court of Appeals that establishes the standard for what constitutes unreasonable delay, but courts from outside the Sixth Circuit have provided persuasive authority. In *Promier Products, Inc. v. Orion Capital LLC*, 708 F.Supp.3d 1376 (N.D. Ill. 2023), the court held that the timeliness of a sanctions motion "depends on such factors as when the movant learned of the discovery violation, how long he waited before bringing it to the court's attention, and whether discovery has been completed." *Id.* at 1383 (citing *Long v. Howard Univ.*, 561 F. Supp. 2d 85, 91 (D.D.C. 2008)). In *Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494 (D. Md. 2009), the court held that spoliation motions should "be filed as soon as reasonably possible after discovery of the facts that underlie the motion. *Id.* at 508. That is because spoliation motions "are fact intensive, requiring the court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it

was not preserved." *Id.* Spoliation motions are also time-intensive undertakings; a court may have to hold a hearing, consider remedies that may end the litigation or severely alter its course, or even order additional discovery to take place. *Id.* Thus, the least disruptive time to raise this issue is during the discovery phase; raising this issue after discovery has closed or after dispositive motions have been filed can disrupt the pretrial schedule. *Id.* Because the issue of waiver is fact-intensive, the Court will examine both categories of information separately.

**1. Defendant waited an unreasonably long time to move for sanctions as to the alleged defamatory texts and the June 15, 2025, text thread.**

Defendant offers several facts to support his assertion that Plaintiff spoliated the texts, and the Court will examine when Defendant learned of each one. First, Defendant points to Plaintiff's argument in his Response to Defendant's Motion for Summary Judgment that there is not a single text between Plaintiff and Tiller or in the text thread with Tiller, Defendant, Plaintiff, and Ingram where Tiller criticized Plaintiff. (DN 114, at PageID # 3418-189 (citing DN 62, at PageID # 1744-45.) Second, Defendant references a lawsuit where Plaintiff sued Tiller for defamation. (*Id.* at PageID # 3419). In that lawsuit, Defendant claims that Plaintiff attributed to Tiller "nearly identical statements to those he now claims that [Defendant] made." (*Id.*) Third, Defendant states that Plaintiff never produced any text messages referencing those statements. Fourth, Defendant asserts that Plaintiff was sanctioned by the Fayette Circuit Court for allowing his cellular devices to be destroyed. (*Id.* at PageID # 3420.) Finally, Defendant cites testimony from Plaintiff indicating that he "continued to dispose of every cellular device he owned between 2015 and 2020, and still other evidence indicates that Dorn also destroyed the cell phone he purchased for Tiller to use during the 2015 time-period." (*Id.*)

As will be discussed in greater detail below, the Court does not find that these assertions support an inference of spoliation. But assuming for procedural purposes that they do, the Court

will examine when Defendant learned of each one. Defendant learned of Plaintiff's argument in his Response Brief when Plaintiff's response Brief was filed, and that was on March 21, 2025. (DN 62.) When arguing that Plaintiff lost this information, Defendant cites to the January 8, 2025, deposition of Plaintiff. (DN 114-2.) Furthermore, given the fact that counsel for Defendant, Grahmn N. Morgan, was served with the order dismissing Plaintiff's case as a sanction in 2017 (DN 114-3, at PageID # 3492), the Court presumes this was when Defendant learned of this as well.

But even if the Court were to interpret these events in the light most favorable to Defendant, the Court would still find that Defendant waited an unreasonably long time to bring this Motion. Assuming that the argument Plaintiff made in his Response Brief was truly a new argument, Defendant still knew that he would make the opposite argument, that Tiller had his own reasons to terminate Plaintiff, before Plaintiff ever filed his Response. Defendant had made this argument as early as February 28, 2025, in his Motion for Summary Judgment. (DN 50, at PageID # 840.) Defendant had also based this argument on a deposition of Tiller that occurred in 2018. (*Id.* at PageID # 838) (citing DN 50-1, at PageID # 858-60.) The Court can thus infer that at some point between 2020 (when this case was filed) and February of 2025 (when Defendant filed his Motion for Summary Judgment), Defendant made the decision to argue that Tiller had his own reasons for firing Plaintiff. As early as January of 2025, Defendant learned that Plaintiff lost information relevant to this argument. Yet, Defendant filed his Motion for Spoliation Sanctions in November of 2025. At best, Defendant waited just over *eight months* to file his Motion after learning of the facts supporting his Motion. This is too long of a delay to be reasonable and Defendant fails to account for it. *See Larios v. Lunardi*, 442 F. Supp. 3d 1299, 1306 (E.D. Cal. 2020) ("Plaintiff's opposition does not explain why his nine-month delay is reasonable; nor can the [c]ourt identify a

sound basis for reaching that conclusion. For this reason, the [c]ourt denies Plaintiff's motion for Rule 37(e) spoliation sanctions."). Instead, Defendant argues that his Motion is timely because, at the time it was filed, there were no deadlines for pretrial motions, and the Court represented that Defendant could file his motion "pursuant to whatever deadlines there are for pretrial motions." (DN 135, at PageID # 4826) (citing DN 135-1, at PageID # 4839). But even if Defendant's Motion was filed in compliance with the deadlines set by the Court, that would not obviate Defendant of his duty to file any motions for sanctions "as soon as reasonably possible after discovery of the facts that underlie the motion." *Goodman*, 632 F. Supp. 2d at 508.

**2. Defendant waited an unreasonably long time to move for sanctions as to Plaintiff's communications with Cox.**

The analysis as to Plaintiff's communications with Cox is similar to the analysis as to the alleged defamatory text messages and the June 15, 2015, text thread. But the Court can confirm that Defendant knew of this issue as early as January 30, 2025, the date of the status conference. (DN 135-1, at PageID # 4836) ("[W]e have an issue with one of their witnesses deleting information after a subpoena was served on him for a deposition…"). The Court therefore finds that Defendant's delay of nine months is similarly unreasonable. But even if Defendant had not waived his right to seek relief, Defendant's Motions would fail on the merits regardless.

**B. Before the Court may issue sanctions under Rule 37(e), the information at issue must have actually been lost.**

Rule 37(e) only applies if the ESI is actually lost. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. ESI is often stored in multiple locations, so loss from one source may be harmless when substitute information can be found elsewhere. *Id.* This is especially true for text messages and e-mails, where the sender and recipient of text messages and e-mails are both custodians of the ESI in question. *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp.

3d 488, 497 (S.D.N.Y. 2016) (e-mails); *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) (text messages).

**1. The Court cannot conclude that Plaintiff lost Tiller's alleged defamatory text messages.**

Based on the evidence before the Court, the Court finds it plausible that Plaintiff at some point had possession of Tiller's allegedly defamatory text messages. While the Court is not convinced that Plaintiff had these text messages in any of *his* cell phones, it is plausible that Tiller's old cell phone—the one that Tiller sent to Plaintiff in July of 2015—contained the alleged defamatory text messages. Tiller sent his cell phone to Plaintiff in mid-July of 2015. (DN 114-4, at PageID # 3496.) Plaintiff sued Tiller for defamation in August of 2016. (DN 47-1, at PageID # 522.) In Plaintiff's counterclaims filed in that litigation, he alleged that "[b]etween the months of June and July 2015, Tiller made the following defamatory statements..." (DN 114-1, at PageID # 3445.) It would thus make sense that, if Tiller were using that cell phone to defame Plaintiff, he would have started doing so in June 2015 and stopped doing so in July 2015, when he sent his cell phone to Plaintiff. Moreover, Plaintiff's knowledge of the timing and content of these defamatory statements would indicate that the cell phone Tiller used to defame Plaintiff would have been the one Plaintiff received from Tiller. After all, it is notable that, to Plaintiff's knowledge, Tiller apparently stopped defaming him around the same time that Tiller sent him his cell phone. Plaintiff does explain this by asserting that others had shown him those text messages but refused to give them to him. (DN 114-2, at PageID # 3460.) But this explanation has several issues. First, Plaintiff softens this explanation by saying he "believe[d] that there [had] been times that people showed [him] messages and didn't want to share the messages," but he could not remember if those messages were about Tiller. (*Id.*) Second, Plaintiff only says that those who had those text messages did not want to share them for fear of getting on Tiller's bad side because he was a

celebrity, but Plaintiff does not say that those were the defamatory text messages. (*Id.* at PageID # 3462-63.) Third, even if those were the defamatory text messages, that does not foreclose the possibility that those text messages were sent from Tiller's old cell phone.

Ultimately, the Court does not have enough information to conclude that these text messages were lost. To be sure, Tiller certainly does not have them anymore. (DN 49-2, at PageID # 808.) But Plaintiff might, or might have had them at some point. Even if Plaintiff had Tiller's old cell phone, and that cell phone contained defamatory text messages, Defendant has not convinced the Court that the cell phone was destroyed. To support his argument that the cell phone was destroyed, Defendant provides the Court with the request for Tiller's cell phone, in addition to the January 2, 2025, email from counsel for Plaintiff wherein he states that Tiller's phone records from January of 2015 through June of 2015 were all Plaintiff intended to produce. (DNs 114-5, 57-23.) But Defendant has not provided the Court with any evidence as to his efforts to obtain Tiller's cell phone in the ten months between the date of the letter and the day Defendant filed his Motion for Sanctions. Defendant has not provided the Court with any deficiency letters regarding the nonproduction of Tiller's cell phone. Defendant has not requested a telephonic status conference with the Court to address the matter of Tiller's cell phone. Defendant has not sought the data from Plaintiff or Tiller's service providers. Defendant has not even filed a motion to compel Tiller's cell phone.[2] Instead, Defendant escalated the topic from a request for production straight to a motion for sanctions.[3]

---

[2] Defendant attaches as an exhibit two orders issued by the Fayette County Circuit Court along with Tiller's discovery requests from 2016 as evidence that Plaintiff was ordered to produce Tiller's cell phone, implying that this very issue had been briefed and argued before. (DNs 114-9, 114-12, 114-14). A cell phone may *store* electronic media that can be reproduced as physical media, but it is not *itself* physical media; a litigant may understand a request for electronic media to include e-mails stored in a computer, but not the computer itself. The Court is thus unconvinced that the issue of Tiller's cell phone had been briefed and argued before.

[3] To be clear, the Court does not hold that these are requisite procedural steps that litigants must take before they may file motions for sanctions based on spoliation. Instead, the Court lists them as examples of evidence that could have allowed the Court to conclude that relevant information had been destroyed.

But even if Plaintiff had Tiller's cell phone, and that cell phone contained defamatory text messages, and Plaintiff destroyed it, that would not mean the text messages were lost. This is not a case where a variety of data was lost in the destruction of a single cell phone; Defendant knows exactly what he is asking for. The requested information is a specific set of text messages sent to a specific group of individuals. Until the Court can confirm that those individuals no longer have those text messages, the Court cannot conclude that the information was lost.

**2. The Court cannot conclude that the June 15, 2015, text thread was lost.**

Defendant also asserts that the text thread involving Plaintiff, Defendant, and Ingram was destroyed because it was not produced. But much like Tiller's text messages, the text thread involves multiple individuals. Three people at minimum were involved in the text thread, meaning three people at one point each possessed the text thread. Yet aside from an assertion that Defendant does not remember the text thread, Defendant provides the Court with nothing to conclude that Defendant tried to obtain the text thread from his cell phone data or from Ingram's. Therefore, the Court cannot conclude that the text thread was even lost.

**3. The Court concludes that Plaintiff's communications with Cox have been lost.**

However, the Court finds that text communications between Plaintiff and Cox have been lost. To begin, Plaintiff does not have any text messages with Cox prior to 2020. (DN 115-6, at PageID # 3797.) This is despite the fact that Plaintiff and Cox communicate with one another through text messaging. (DN 115-4, at PageID # 3771.) Nor does Cox have any text messages with Plaintiff after March of 2024. (*Id.* at PageID # 3719.) As these two individuals did undoubtedly once possess the messages but cannot produce them, they are the only ones who could have had access to those text messages. Therefore, the Court finds that they have been lost.

**C. Plaintiff's duty to preserve evidence likely arose in June of 2015.**

Under Rule 37(e), a court may only award sanctions if lost ESI should have been preserved in anticipation or conduct of litigation. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Rule 37(e) is based on the common-law duty to preserve information when litigation is reasonably foreseeable and thus does not apply when information is lost before the duty to preserve arises. *Id.* The duty to preserve arises when a party has notice that evidence in his or her possession is relevant to litigation or should have known that such evidence may be relevant to future litigation. *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008).

Defendant argues that Plaintiff's duty to preserve evidence arose as early as 2015 because Plaintiff was suspicious that Defendant was trying to interfere with his relationship with Plaintiff in 2015. (DN 115, at PageID # 3675.) In his Response, Plaintiff does not address the question as to when his duty to preserve evidence arose, but Plaintiff has previously argued that Defendant's duty to preserve evidence arose in September of 2016 because that was when Plaintiff filed a motion for leave to file a third-party complaint against Defendant. (DN 47-1, at PageID # 522.)

In *Schnatter v. 247 Group, LLC*, No. 3:20-CV-00003-BJB-CHL, 2022 WL 2402658 (W.D. Ky. Mar. 14, 2022), *report and recommendation adopted*, Text Order, No. 3:20-CV-00003-BJB-CHL (W.D. Ky. Sept. 21, 2022), Dkt. No. 219, this Court concluded that the plaintiff's duty to preserve relevant information arose the day that a Forbes article quoting the plaintiff's secretly recorded conversation was published. *Id.* at *7. Within days of the article's publication, the plaintiff retained legal counsel to represent his interests in the matter. *Id.* The Court thus concluded that the date the article was published was the day that the plaintiff was aware of potential litigation and thus had a duty to preserve relevant information. *Id.*

Here, Plaintiff was terminated on June 15, 2015. (DN 114, at PageID # 3422.) By June 21, 2015, Plaintiff had already hired a lawyer to represent him in a dispute with Tiller. (DN 114-

6, at PageID # 3503.) But this is not enough to establish that Plaintiff knew of Defendant's involvement in his termination. People may hire attorneys for a variety of reasons, and the fact that Plaintiff did so at this point is only enough to conclude that Plaintiff foresaw a dispute between himself and Tiller, not necessarily this litigation. Nor can Plaintiff's obligation to preserve evidence relevant to that dispute affect his obligation to preserve evidence in this dispute. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. It would not be until Cox informed Plaintiff that Defendant was allegedly saying negative things about him that his duty to preserve relevant information arose because that was the date that he became aware of Defendant's involvement and the potential for litigation with Defendant. *See Schnatter*, 2022 WL 2402658, at *6 (holding that the plaintiff's duty to preserve evidence arose the day he became aware that the defendants had allegedly wronged him and that he intended to pursue legal remedies). While there is nothing in the record to indicate when Cox informed Plaintiff of Defendant's involvement, Cox's deposition indicates that he told Plaintiff shortly after he heard Defendant's conversation with Dorn. (DN 115-4, at PageID # 3767-68.) The Court can also infer that the conversation in question took place in April of 2015 at the latest, because that was the last month that Tiller lived with Cox. (DN 8 at ¶ 36.) Since Cox told Plaintiff of this conversation shortly thereafter, the Court can further infer that Plaintiff knew of Defendant's involvement somewhere around this time. Therefore, the Court holds that Plaintiff's duty to preserve information arose in June of 2015, when Plaintiff hired a lawyer to address his dispute with Tiller, and after Plaintiff likely discovered Defendant's involvement.

**D. Before the Court may issue sanctions under Rule 37(e), the Court must find that the litigant failed to take reasonable steps in preserving information.**

Under Rule 37(e), parties do not have to preserve all relevant ESI perfectly. Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment. If a party takes reasonable steps to preserve

relevant ESI, and it is lost anyway, Rule 37(e) does not apply. *Id.* In determining whether a party took reasonable steps to preserve relevant ESI, courts should consider, among other factors, the party's sophistication, and the proportionality of preservation efforts. *Id.* Moreover, once the duty to preserve attaches, a party must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure relevant documents are not deleted. *Crown Battery Mfg. Co. v. Club Car, Inc.*, 185 F.Supp.3d 987, 999 (N.D. Ohio 2016).

**1. Plaintiff took reasonable steps to preserve information on his phones.**

Plaintiff represented to the Fayette Circuit Court that, in the summer of 2016, Plaintiff dropped one of his cell phones into Long Island Sound (DN 114-13, at PageID # 3614), and another into a swimming pool at a friend's house in New York. (DN 114-15, at PageID # 3629.) While the Court is certainly not suggesting that litigants should dive in after electronics to preserve relevant information, litigants should take reasonable steps to ensure that relevant information stored on their electronic devices is securely preserved. Defendant argues that Plaintiff failed to do this, pointing to two depositions to argue that he was able to preserve some of the data from the phones and therefore should have preserved that to which Defendant sought access. Specifically, Defendant says that Plaintiff "self-selected the evidence he believed helpful to his claims from his cellular device," in 2016. (DN 114, at PageID # 3422.) Given Defendant's reliance on Plaintiff's depositions, it is necessary that the Court examine the cited excerpts.

> Q. When you say you may have, I'm asking if you have a specific recollection of doing it once with prior counsel, uploading those messages to a program, and then doing it a second time with different attorneys?
> A. Yeah…I believe that I uploaded all relevant text messages for my previous attorneys and my current attorneys.
> Q. When you say all relevant messages, tell me what you mean by relevant?
> …
> A. Messages that would pertain to my business with Bryson.
> Q. Were there any messages that related to Mr. Tiller that you did not provide your…

(DN 114-10, at PageID # 3546-47.) Defendant does not include the following page of the deposition; it simply cuts off at the last line. But Plaintiff includes the rest.

> Q. Were there any messages that related to Mr. Tiller that you did not provide your attorneys with?
> A. Not that I recall.
> Q. When you say that you provide messages that pertain to your business with Mr. Tiller, tell me what kinds of text messages you're talking about business with Mr. Tiller.
> …
> A. Anything me and Mr. Tiller discussed, anything that me and other people involved in business that Mr. Tiller and I have discussed.

(DN 125-8, at PageID # 4361-62.) The other excerpt Defendant cites to reads as follows:

> Q. When you said before something like the stuff that was relevant to this litigation, I am asking if somebody made an exact copy of everything on your phone. Do you know?
> A. I don't know.
> Q. Tell me how the download occurred. Did you send them things?
> A. I really don't recall.
> Q. Did they take the phone from you and have a forensic expert image it?
> A. I don't recall.
> Q. Well, did you ever give them your phone?
> A. This is many years ago. I really don't recall.
> Q. As you sit here today, you don't remember a time when you would have given your entire phone over to your counsel. Is that right?
> A. I don't think so.
> Q. And that would have been the 859 number?
> A. It would have been any number.
> Q. Do you recall if it was the 818 number as well?
> A. It would have been any number. I know that-
> Q. Do you have a specific recollection of giving your counsel the phone associated with the 818 phone number to make an exact copy of?
> A. I don't recall.
> Q. And that is the same for the 859 number. Correct?
> A. Correct.

(DN 114-2, at PageID # 3477-78.) While Plaintiff's general lack of recollection is admittedly unhelpful for Defendant, it falls far short of proving that Plaintiff self-selected evidence he

believed was helpful to his case. Nor does the Court see how Plaintiff's determination as to what was relevant necessarily entails a determination as to what was helpful to his case.

Finally, Defendant argues that Plaintiff failed to preserve his communications with Cox prior to 2020 by replacing every cell phone he owned between 2015 to 2020. But the device is not what matters for spoliation purposes, it is the information that matters. Thus, the Court will need to examine Plaintiff's preservation efforts regarding the information.

In 2017, Plaintiff testified that his iPhone automatically saved data onto iCloud. (DN 125-7, at PageID # 4339.) But if Plaintiff were to manually delete anything from his iPhone, then such data would be deleted from iCloud as well. (*Id.* at PageID 4339-40.) Plaintiff further testified that he regularly deletes conversations and other data from his iPhone to free up storage, but that he deliberately refrained from deleting messages relevant to his litigation with Tiller. (*Id.* at PageID # 4341-44.) In 2019, Plaintiff testified that he uploaded all his text messages to a computer program and gave those messages to his attorneys, but he could not remember when he did so, or how many times. (DN 125-8, at PageID # 4360.) However, Plaintiff had done so at least once with his first attorney in the Tiller litigation, and a second time with his second attorney. (*Id.* at PageID # 4393.) When Plaintiff did so, he searched for any text message with Tiller, about Tiller, regarding Tiller, and regarding Plaintiff's business with Tiller. (*Id.* at PageID # 4391.) But Plaintiff also searched using Defendant's name as a key word, meaning any conversation concerning Defendant should have been found. (*Id.* at PageID # 4392.)

It is true that all of Plaintiff's communications with Cox before 2020 have been lost, but Rule 37(e) demands reasonableness, not perfection. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The evidence in the record demonstrates that, rather than self-selecting evidence he believed to be helpful to his case, Plaintiff vigilantly searched for any communication

he believed was responsive.[4] (DN 125-8, at PageID # 4377) ("I recall producing everything that I was asked to produce related to mine and Bryson's business dealings and communications and any music business communications involving Bryson in any way. And like I said, that was the majority … of what I remember of my music business dealings being in that time frame.") Furthermore, this is not a case involving a large organization with sufficient resources to manage large amounts of data; it is one individual faced with the task of reviewing voluminous discovery. (DN 114-2, at PageID # 3464) ("I believe that there is [sic] like [twenty] thousand pages have been produced and those have been included in them.").

**2. The Court does not have enough information to conclude that Plaintiff failed to take reasonable steps to preserve information on Tiller's cell phone.**

Regarding Tiller's cell phone, the Court does not know when, how, or even if it has been destroyed. But assuming that Tiller's cell phone was destroyed after Plaintiff's duty to preserve relevant information attached, that would not be enough for the Court to conclude that Plaintiff failed to take reasonable steps to preserve relevant information. What matters for Rule 37(e) purposes is not the device; it is the information. From the record, Plaintiff was able to produce phone records related to that cell phone, indicating that he had preserved at least some information from the device. (DN 58.) Without evidence of Defendant's efforts to obtain any more information from Tiller's cell phone, the Court cannot evaluate the reasonableness of Plaintiff's preservation efforts with respect to the data from the cell phone. In the absence of such

[4] To be certain, the Court is not holding that it is appropriate for a party to destroy requested evidence that he or she deems to be non-discoverable, as opposed to non-responsive. Such a practice would deprive the parties, and the Court, of the opportunity to assess the discoverability of such evidence. However, the Court cannot conclude, based on the record, that Plaintiff destroyed any evidence that was requested based on his beliefs as to the discoverability of the evidence.

information, and given that Plaintiff has preserved at least some information, the Court cannot conclude that Plaintiff's preservation efforts were unreasonable.

**3. The Court will not impute Cox's alleged spoliation to Plaintiff.**

Finally, the parties dispute whether Cox's alleged spoliation can be imputed to Plaintiff. While the Sixth Circuit Court of Appeals, to this Court's knowledge, has never explicitly addressed whether or when a nonparty's spoliation may be imputed to a party under Rule 37(e), the Court has upheld a denial of spoliation sanctions based on the party's lack of control over the allegedly spoliated evidence. *Adkins v. Wolever*, 692 F.3d 499, 504 (6th Cir. 2012). Therefore, the question of whether Cox's alleged spoliation may be imputed to Plaintiff can be answered by determining whether Plaintiff had control of text messages in Cox's possession.

The Sixth Circuit, in *In re Bankers Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995), stated that "federal courts have consistently held that documents are deemed to be within the '*possession, custody or control*' for purposes of Rule 34 if the party has actual possession, custody or control, or has the legal right to obtain the documents on demand." *Id.* at 469 (emphasis in original) (citing *Resolution Tr. Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 110 (D. Colo. 1992)). Some courts and commentators interpret this statement as the Sixth Circuit's adoption of the "legal right" standard. *See e.g., Halabu Holdings, LLC v. Old Nat'l Bancorp*, No. 20-10427, 2020 WL 12676263, at *3 (E.D. Mich. June 9, 2020) (identifying "the principle enunciated in *In re Bankers Trust Co.*" as requiring "that the party served with the document request 'has the legal right to obtain the documents on demand' from someone else"); *J.S.T. Corp. v. Robert Bosch LLC*, No. 15-13842, 2019 WL 2354631, at *6 (E.D. Mich. June 3, 2019) ("Courts in the Sixth Circuit have adopted the Legal Right Standard ...."), *report and recommendation adopted*, No. 15-13842, 2019 WL 2343705 (E.D. Mich. June 3, 2019); *Pasley v. Caruso*, No. 10-CV-11805, 2013 WL 2149136,

at *5 (E.D. Mich. May 16, 2013) (noting, as to the "practical ability" standard, that "the Sixth Circuit has not adopted this 'expansive notion of control'"); *Flagg v. City of Detroit*, 252 F.R.D. 346, 353 (E.D. Mich. 2008) ("The Sixth Circuit and other courts have held that documents are deemed to be within the 'control' of a party if it 'has the legal right to obtain the documents on demand.'").

Yet, "[o]ther courts within the Sixth Circuit have found that 'control' includes the practical ability to produce documents from a third party." *St. Clair Cnty. Emps'. Ret. Sys. v. Acadia Healthcare Co.,* No. 3:18-cv-00988, 2022 WL 4095387, at *9 (M.D. Tenn. Sept. 7, 2022), *aff'd*, No. 3:18-cv-00988, 2023 WL 3659734, at *3 (M.D. Tenn. May 25, 2023) (stating that, "[i]mportantly, *Bankers Trust* does not limit 'control' to only that which a party has a legal right to obtain" and acknowledging that, "[t]o be sure, some district courts within the Sixth Circuit have applied the 'legal right' test; but courts within the [c]ircuit have also found that 'control' includes the practical ability to obtain documents from a third party"); *see also Union Com. Servs. Ltd. v. FCA Int'l Operations LLC*, No. 16-cv-10925, 2018 WL 558760, at *2 (E.D. Mich. Jan. 25, 2018) ("[D]iscovery material is within a party's control when the party has the 'practical ability to obtain the documents, particularly when the opposing party does not have the same practical ability to do so.'") (quoting *S2 Automation, LLC v. Micron Tech., Inc.*, No. CIV 11–0884, 2012 WL 3656454, at *33 (D.N.M. Aug. 9, 2012)). This Court has favorably cited the "practical ability" test every time it has been presented with the issue. *Cooper v. Bower*, No. 5:15-CV-P249-TBR, 2017 WL 11717027, at *1 (W.D. Ky. Apr. 6, 2017); *Belden v. Jordan*, No. 3:16CV-P511-TBR, 2017 WL 3485006, at *1 (W.D. Ky. Aug. 14, 2017); *Sublett v. Henson*, No. 5:16-CV-00184-TBR, 2018 WL 3939333, at *5 (W.D. Ky. Aug. 16, 2018); *Gregory v. Goard*, No. 5:21-CV-P167-TBR, 2022 WL 22879578, at *2 (W.D. Ky. Oct. 7, 2022); *see Jackson v. E-Z-GO Div. of Textron, Inc.*, No. 3:12-

CV-154-TBR, 2016 WL 6211719, at *3 (W.D. Ky. Oct. 24, 2016). Therefore, the Court will consider whether Plaintiff had the practical ability to obtain text messages from Cox.

Plaintiff has no contractual right to demand Cox's text messages, but "[a] party that lacks a contractual right to obtain a third-party's documents ... may nonetheless be found to have control over the third-party's documents based on a demonstrated ability to access those documents in the ordinary course of business." *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 334 F.R.D. 68, 73 (S.D.N.Y. 2020) (citing *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441–42 (D.N.J. 1991)). Control has also been found where a custodial nonparty has a demonstrated willingness to produce information at the request of the party. *St. Clair*, 2022 WL 4095387, at *10.

Here, nothing indicates that Plaintiff has the practical ability to obtain Cox's text messages. Although Plaintiff and Cox are friends, Defendant has not shown the Court that Cox has been willing to collect and produce information for Plaintiff on demand. Nor has Defendant shown that Plaintiff has the ability to access Cox's messages as a matter of course. Moreover, Plaintiff's counsel does not represent Cox, and in fact encouraged Cox to seek independent counsel. (DN 126, at PageID # 4435.) Finally, the Court rejects Defendant's argument that Cox has a financial stake in the litigation. Although Plaintiff has promised he would "take care" of Cox if he became successful (DN 115-7), Cox has denied that he was being paid to testify or provide an affidavit in this matter. (DN 126-2, at PageID # 4500.) The record also leads the Court to plausibly infer that Plaintiff intends to help Cox out financially regardless of the result in this litigation, further indicating that Cox does not have a financial stake in this case. *Cf. Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656 (S.D.N.Y. 2017), *rev'd on other grounds sub nom.*, *Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.*, 906 F.3d 253 (2d Cir. 2018) ("Cohn also has a financial interest in the

outcome of this litigation, since he is entitled to a percentage of the Film's net receipts, which would be zero should [p]laintiffs prevail."). Therefore, the Court will not impute any alleged spoliation by Cox to Plaintiff.[5]

**E. Before the Court may issue sanctions, it must find that the information cannot be replaced.**

Before a court may employ any of the measures authorized by Rule 37(e), it must first consider whether it can address the loss by ordering additional discovery. Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment. If the information is restored or replaced, no further measures should be taken. *Id.* However, any attempt to restore lost information should be proportional to the apparent importance of the lost information to claims or defenses in the litigation. *Id.* A court should not order substantial measures to restore or replace information that is marginally relevant or duplicative. *Id.*

Regarding Tiller's text messages, and the June 15, 2015, text thread, the Court cannot conclude that the information cannot be replaced through additional discovery. Defendant argues that Plaintiff "admit[ted] he no longer has access to 2015-2020 ESI he has not already produced." (DN 114, at PageID # 3427.)

> Q. How about between 2015 and 2020, did you do anything to preserve the phones that you had during that time period?
> A. I had downloaded everything off of the phones before getting rid of them. I produced everything.
> Q. You didn't produce any communications with Mr. Cox prior to 2020. Correct?
> A. I don't recall.
> Q. I think you said a moment ago that when you searched for them, that you didn't find any before 2020. Is that right? Is that your testimony?
> …
> A. Right.
> Q. If they have not been produced in this case, you no longer have them. Is that right?

[5] This is not to say that evidence that Plaintiff attempted to sway Cox's testimony is completely irrelevant. Such conduct may be evidence that Plaintiff intended to deprive Defendant of the use of the information in litigation.

A. Right.

(DN 114-2, at PageID # 3474-75.) The Court notes that *Plaintiff* no longer has access to ESI from 2015-2020 that he did not already produce. However, this is not enough for the Court to conclude that the information cannot be replaced. Defendant's counsel previously represented to the Court that Defendant had preserved every communication with Plaintiff through June of 2015, meaning Defendant plausibly could have saved the June 15, 2015, text thread. (DN 57, at PageID # 1179) ("Dominique searched for and, to the extent they existed, collected and preserved communications to or from or about Dorn through June 2015."). But even if Defendant did not save the text thread, John Ingram could have saved it in his cloud storage. This is true for the allegedly defamatory text messages sent by Tiller as well. The individuals Tiller communicated with could have those text messages saved in cloud storage.

Regarding the communications between Cox and Plaintiff, Defendant emphasizes that Cox turned off his iCloud backup, permanently deleting any communications with Plaintiff prior to March of 2024. (DN 115, at PageID # 3670.) Cox never testified that he permanently deleted his communications with Plaintiff from his iCloud, only from his phone. (DN 115-4, at PageID # 3719.) When asked if more communications stored on his iCloud could have been deleted, Cox stated he was not sure. (*Id.* at 3739.) There does not appear to be any follow-up from Defendant's counsel. Thus, the Court cannot conclude that the lost ESI cannot be replaced by additional discovery.

**F. The Court does not find that Defendant suffered prejudice by the loss of information.**

Under Rule 37(e)(1), the court may order measures no greater than necessary to cure the prejudice suffered by the party claiming spoliation, but this requires a threshold showing of

prejudice. Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. To determine prejudice, the Court must determine the importance of the lost ESI to the litigation. *Id.* The rule does not place a burden of proving or disproving prejudice on one party or the other because determining the content of lost information may be a difficult task in some cases and placing the burden of proving prejudice on the party that did not lose the information may be unfair. *Id.* But in some cases, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may seem sufficient to meet the needs of all parties. *Id.* Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. *Id.* Accordingly, judges have the discretion to determine how best to assess prejudice in particular cases.

**1. The loss of Tiller's text messages is not prejudicial to Defendant.**

Regarding the text messages from Tiller about Plaintiff, Defendant argues that these messages are supposed to rebut Plaintiff's "new argument that Dominique had to have caused his termination because in the 'hundreds of exchanged texts between Tiller' there is not a single text where 'Tiller criticized Dorn's management performance or lifestyle choices' and similarly 'there is not a single negative text message related to Dorn's job performance or lifestyle in the team text thread consisting of Tiller, Dorn, Defendant, and Ingram.'" (DN 114, at PageID # 3418.)

To begin, even if Plaintiff destroyed the information in question, it would not rebut that argument. The argument Plaintiff made was that "[i]n the hundreds of exchanged texts between Tiller and Dorn from October of 2014 to June of 2015, there is not a single text where Tiller criticized Dorn's management performance or lifestyle choices before Defendant entered the picture, and even then such texts are vague and minimal." (DN 62, at PageID # 1744-45.) Just because Tiller never criticized Plaintiff in his text messages *with Plaintiff* does not mean that Tiller

never criticized Plaintiff in his text messages with other people. In fact, this is what Plaintiff asserted in his counterclaim against Tiller. (DN 114-1, at PageID # 3446) ("The statements made by Tiller in the preceding paragraph were published to Travoris Hollins p/k/a King Vory; Stephon Warren, Ryan Cox, and/or Tunji Balogun, among others, via in-person communications, telephonic conversations, and text messaging.").

Second, Defendant states that Plaintiff "does not dispute that the [m]agistrate [j]udge has already found the missing text messages where Tiller criticized Dorn would be among the 'best evidence … of any written communications documenting Tiller's reasons for firing [Dorn]." (DN 135, at PageID # 4829) (citing DN 81, at PageID # 2533-34.) Even if Plaintiff does not dispute it, the magistrate judge certainly does. In ruling on Plaintiff's Motion for Sanctions, the Court noted that there was very little evidence to conclude that Defendant or Tiller sent written communications to one another regarding Tiller's reasons for firing Plaintiff. (DN 81, at PageID # 2533.) To explain that conclusion, the Court stated that the "best evidence *the Court can find* of any written communications documenting Tiller's reasons for firing Plaintiff *is in Plaintiff's deposition testimony*." (*Id.*) (emphasis added). The Court was clearly referring to Plaintiff's deposition testimony, not text messages, as the best evidence *available to it* that such written communications existed.

**2. The loss of the June 15, 2015, text thread does not prejudice Defendant.**

Regarding the text string including Plaintiff, Defendant, and Ingram, Defendant argues that Plaintiff's failure to produce this text string deprives him of the opportunity to assess the communication or cross-examine Plaintiff on its contents "despite [Plaintiff's] concession that it is the very reason he filed this lawsuit against [Defendant]." (DN 114, at PageID # 3428.) The Court finds that the absence of this text string does not prejudice Defendant. If anything, it appears

that *Plaintiff* would be the one at a disadvantage if this text thread were not produced. If Plaintiff does not have the text thread, he would have less evidence to support his contention that Ingram's text was part of a nefarious scheme to replace him with Defendant as Tiller's manager. But even if Plaintiff had produced the thread, it is difficult to imagine what else it could possibly say. Plaintiff represented in his Amended Complaint that the text message was a request for Ingram to meet with Plaintiff and Defendant. (DN 8, at PageID # 70.) This text message is what led to Plaintiff's termination. (DN 114-2, at PageID # 3472.) The Court does not see what this text message could be probative of, other than the fact that Plaintiff was terminated, a fact that is not even in dispute.

**3. The loss of Plaintiff's messages with Cox is not prejudicial to Defendant.**

Finally, Defendant argues that the destruction of Plaintiff's text messages with Cox has prejudiced Defendant because it "impedes Dominique's ability to test the veracity of Cox's claim that he overheard the statements at issue in 2015 and then reported them to Dorn shortly thereafter." (DN 115, at PageID # 3676.) It is unclear to the Court how such text messages would enable Defendant to test the veracity of Cox's claim. Plaintiff stated in one of his interrogatory responses that any relevant communications he had with Cox would have been through in-person conversations or phone calls. (DN 125-4, at PageID # 4272.) Furthermore, if the Court were to assume that the text messages were just Cox repeating what he told Plaintiff, then their absence would prejudice Plaintiff more than Defendant, because Plaintiff has less evidence to support his claims. While that may not necessarily be what the texts say, the Court does not have enough information to presume that they could be anything else that may be relevant to this litigation.

**G. The Court does not find that Plaintiff intended to deprive Defendant of the information's use in litigation.**

If Defendant demonstrates that Plaintiff acted with the intent to deprive him of the information's use in litigation, then the Court need not find prejudice. Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment. But a showing of negligence or even gross negligence "will not do the trick." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) (citing Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment).

Regarding Tiller's texts and the June 15, 2015, text thread, Defendant advances several reasons for the Court to infer that Plaintiff intended to deprive him of the information. First, Defendant argues that when Plaintiff filed claims related to the Management Agreement, he already believed Defendant was the source of division between him and Tiller. (DN 114, at PageID # 3429.) Second, Defendant states that Plaintiff failed to produce requested communications when he was served with discovery requests in March of 2016. (*Id.*) Defendant then goes on, in his Reply Brief, to argue that Plaintiff "self-selected" the evidence he produced in the prior suits involving Tiller. (DN 135, at PageID # 4830.) Third, Defendant mentions a discovery issue that was decided nine years ago by a different court in a different suit. (DN 114, at PageID # 3430.)

To begin, Defendant's first two arguments are just the same arguments Defendant made in the attempt to persuade the Court that Plaintiff committed the act of spoliation, not that he acted with the requisite mental state to justify an adverse inference. Evidence of the act is not necessarily evidence of the mental state; they are two separate elements. *See Dorn v. Dominique*, No. 3:20-cv-118-BJB, 2025 WL 2813902, at *4 (W.D. Ky. Sept. 30, 2025). Second, most requests for production call for some degree of self-selection, especially if they are requests for documents with specific parameters within the exclusive knowledge and possession of the other party.[6] Otherwise, litigants would have to drown their opponents in voluminous document dumps.

[6] Defendant himself self-selected the evidence he wanted to produce in response to Plaintiff's discovery requests. (DN 57-22, at PageID # 1521) ("Subject to and without waiving these objections or the above General Objections,

Defendant then references the fact that Plaintiff's counterclaims against Tiller in the previous litigation were dismissed. Defendant mentions this fact for two reasons: (1) to argue that the state court's judgment has preclusive effect in this case; and (2) as evidence of Plaintiff's intent to destroy relevant evidence.

**1. The Kentucky state court action does not have preclusive effect on this issue.**

Federal courts must give full faith and credit to the "records and judicial proceedings of any court of any such [s]tate," by law or usage in the courts of such state. 28 U.S.C. § 1738. Accordingly, this Court must give the same preclusive effect to state court judgments that those judgments would be given under the laws of that state. *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982). Plaintiff's counterclaims were dismissed by the Fayette Circuit Court in the Commonwealth of Kentucky. (DN 114-3, at PageID # 3480.) Thus, the Court will look to the laws of the Commonwealth of Kentucky regarding collateral estoppel.

Under the laws of the Commonwealth of Kentucky, an issue is precluded if: (1) at least one party was bound in the prior case; (2) the issue in the subsequent case is the same issue as that in the first case; (3) the issue was actually litigated; (4) the issue was actually decided; and (5) the decision on the issue in the prior action was necessary to the court's judgment and adverse to the party to be bound. *Miller v. Admin. Off. of Cts.*, 361 S.W.3d 867, 872 (Ky. 2011). The Court is not aware of any cases where the Sixth Circuit Court of Appeals, any Kentucky state court, or this Court has considered whether a dismissal as a discovery sanction may serve to preclude additional litigation of that issue in a subsequent case. Nevertheless, this argument fails anyway because the spoliation issue before the Court was not the same issue litigated in the Kentucky action.

---

Defendant states that based on Dorn's Amended Complaint, the relevant time period at issue in this case extends from approximately January 2015 through June 2015 when Dorn contends that he was terminated by Tiller.").

The Court has reviewed the order from the Fayette Circuit Court dismissing Plaintiff's counterclaims (DN 114-3), and it has nothing to do with spoliation at all. In fact, the court does not once mention spoliation in its order. Instead, the court dismissed Plaintiff's counterclaims as a sanction for: (1) failing to comply with the court's two orders to compel; (2) failing to seek leave of the court to reschedule a deposition he was supposed to attend or filing a motion for a protective order as to that deposition; (3) failing to appear for that deposition; (4) misrepresenting to the court his whereabouts on the date of the deposition; (5) delaying and obstructing discovery by misrepresenting the existence or non-existence of documents; and (6) taking steps to prevent Tiller from obtaining discovery from third parties, all despite the court's repeated warnings and issuance of lesser sanctions that failed to deter Plaintiff's counsel's conduct. (*Id.* at PageID # 3489-90.) This sanction was not issued for spoliation. Although the Fayette Circuit Court quoted from testimony regarding Plaintiff's loss of his two phones, this was not pertinent to any determination by that court that Plaintiff intentionally destroyed evidence; it was pertinent to that court's determination that Plaintiff intentionally obstructed Tiller's access to discovery by misrepresenting that he could provide his cell phone for inspection. (DN 114-3, at PageID # 3484.)

**2. The dismissal of Plaintiff's counterclaims in the Kentucky state court action does not prove intent.**

Defendant also mentions the dismissal as evidence of intent. Defendant points out that in that case, Plaintiff claimed his cell phone was destroyed in July of 2016, at or near the time Tiller filed his motion to compel. (DN 114, at PageID # 3429.) Plaintiff then gave three contradictory explanations as to what happened to his device. (*Id.* at PageID # 3430.) Defendant further argues that the "severe sanctions imposed by the [s]tate [c]ourt for willful destruction of evidence did little" to deter Plaintiff's conduct given that Plaintiff has discarded every device he owned between 2015 and 2020. (*Id.*)

To begin, as explained above, the state court did not sanction Plaintiff for willfully destroying evidence; it sanctioned him for obstructing discovery and disobeying court orders. In fact, the state court, in the order dismissing Plaintiff's counterclaims, never made a finding that Plaintiff destroyed evidence, to say nothing of intent to deprive Defendant of the information.

Second, Plaintiff lost very little from those cell phones. In Tiller's 2016 requests for production (DN 114-9), he requested audio recordings of conversations between Plaintiff and Tiller as well as all audio recordings of conversations between Plaintiff and any other person about Tiller. (*Id.* at PageID # 3537-38.) In Tiller's motion to compel (DN 114-11), Tiller argued that this was because Plaintiff would "routinely record[] multiple conversations regarding Tiller and the facts and circumstances surrounding the allegations in this lawsuit," and asked the court to order Plaintiff to turn over the devices he used to record the conversations. (*Id.* at PageID # 3555.) In the court's order to compel (DN 114-12), the court granted Tiller's request and ordered Plaintiff to produce the devices he used to record such conversations, or if the device no longer existed, an explanation as to why the device was no longer in his possession. (*Id.* at PageID # 3605.)

Plaintiff does not dispute that his cell phone was lost, but he does assert that everything from that cell phone, except for the metadata for a single phone recording, was produced. (DN 125, at PageID # 4179.) Of course, Defendant disputes that assertion, arguing that "[c]ommunications related to the reason Dorn was terminated as well as Tiller's actual act of terminating Dorn along with communications between Dorn and his key witness, Ryan Cox, have all been destroyed." (DN 135 at PageID # 4826-27.) If Plaintiff is correct, and that almost nothing from that cell phone had been lost, then it would be unusual for Plaintiff to intentionally destroy his own cell phone while producing almost everything from it if Plaintiff's intention were to deprive Defendant of the information on the cell phone. If Defendant is correct, and the

information at issue has been lost, then it would be unusual for Plaintiff to intentionally delete Tiller's allegedly defamatory text messages if he was suing Tiller for defamation.[7] In either case, Plaintiff's actions do not make sense if he acted with the intent to deprive Defendant of the information in this action.

As for the June 15, 2015, text thread, it is just as far-fetched to conclude that Plaintiff intended to deprive Defendant of this information. Even assuming that Plaintiff were to testify that this text thread existed and was evidence of a conspiracy between Defendant and Ingram, as Defendant argues (DN 114, at PageID # 3422), then it makes little sense for Plaintiff to delete this thread with the intent to deprive Defendant of the information. If the text thread existed, and Plaintiff could produce it, then it should be evidence probative of his claim. Meanwhile, Defendant takes the position that this text was never sent or at least was never sent to Defendant. (DN 135, at PageID # 4830 n. 25) ("Dominique does not recall such a text message having been sent and takes the position that, like a number of other allegations made in this case, this claim by Dorn is also a fabrication.") If the text message never existed, or if Plaintiff could not produce it, then it would benefit Defendant for the text message to be destroyed. While the Court is only assuming the contents of this text message, it has no reason to conjure up other possibilities as to what the text thread could have said.

### 3. Plaintiff's remaining text messages with Cox do not prove intent.

Finally, Defendant asserts that Plaintiff offered incentives to Cox to persuade him to malign Defendant. (DN 115, at PageID # 3678.) If true, this would certainly be evidence that Plaintiff intended to deprive Defendant of relevant information in this matter. But the evidence Defendant

[7] It would also be strange for Plaintiff to destroy Tiller's cell phone if it contained no defamatory text messages. As far as the Court can tell from the record, Plaintiff never claimed that the cell phone he received from Tiller contained defamatory text messages, the Court is only inferring this from the information provided. Moreover, the absence of defamatory text messages from that cell phone would not necessarily mean Tiller did not defame Plaintiff.

provides is thin. Defendant asserts that Plaintiff's counsel accepted service of a subpoena on Cox's behalf, then met with Plaintiff and Cox before Cox turned off his iCloud backup and allegedly destroyed his text messages. (*Id.* at PageID # 3678.) Then, when Cox was deposed, Plaintiff was on the call listening in. (*Id.*) During a break in the deposition, Plaintiff and Cox had a conversation over the phone. (*Id.* at PageID # 3671.) When asked what the conversation was about, Cox claimed it was to discuss mortgage rates. (*Id.*) Defendant also points to an entire month's worth of communications that are missing, leading up to Plaintiff's request that Cox meet with his counsel. (*Id.* at PageID # 3670 n. 32.)

The fact that Cox turned off his iCloud is not proof that Cox intended to deprive Defendant of relevant evidence. Cox did not destroy text messages in his possession by turning off his iCloud, as evidenced by the fact that he still possessed text messages from before the date he turned off his iCloud. (DN 115-4, at PageID # 3719.) If anything, Cox would have risked losing the text messages for good if he were to keep iCloud on before deleting them, as data deleted from a device set to automatically sync to iCloud would also be deleted from iCloud. (DN 125-7, at PageID # 4339-40.) For Cox to have deleted data from his iCloud, he would have either had to keep iCloud on or go into his iCloud and delete them. Given that Cox could not definitively answer whether he had additional messages on his iCloud, he likely did not access his iCloud recently. (DN 115-4, at PageID # 3739.)

Next, Defendant takes issue with the fact that Plaintiff's counsel apparently never advised Cox to keep iCloud on. (DN 115, at PageID # 3678.) While that is true, Plaintiff's counsel also did not advise Cox to turn his iCloud off; Cox did that on his own initiative. (DN 115-4, at PageID # 3719.) Even if the Court were to hold that Plaintiff had control over these text messages and that Plaintiff's counsel should have advised Cox to keep his iCloud on, the most this could prove was

that Plaintiff's counsel was negligent at worst.[8] Negligence is not enough to merit an instruction of adverse inference. *Applebaum*, 831 F.3d at 745.

Defendant also claims that the gaps in the text messages are suspicious. The Court cannot definitively agree. While it is true that Plaintiff does not have any of his communications with Cox before 2020, the timeline of their business partnership may explain this. When the COVID Pandemic had reached the United States in 2020, Plaintiff and Cox began collaborating on a travel experience company to promote a resort in Antigua. (DN 126-2, at PageID # 4459.) As part of their joint venture, Plaintiff and Cox would identify social media influencers to promote the resort. (*Id.* at PageID # 4462.) When asked if he ever communicated with Plaintiff about potential income sources before the two began their joint venture, Cox said he could not recall. (*Id.* at PageID # 4463.) When asked if he and Plaintiff ever exchanged money for anything besides the joint venture, Cox stated he could not recall. (*Id.*) The text messages between the two seem to confirm that Plaintiff and Cox mostly talk about business over text; there is no indication that they would have texted about this litigation, aside from the message sent from Plaintiff advising Cox that his attorney would speak with him. (DN 126-7.) Therefore, the likely reason that there are no text messages before 2020 is that there were no relevant text messages for Plaintiff to preserve before he traded his phone in. This explanation is at least as likely as Defendant's theory, that Plaintiff and Cox collaborated to delete relevant text messages.

**H. Defendant has made misrepresentations to the Court in his briefings.**

Under Rule 11, every written motion must be signed by at least one attorney of record in the attorney's name, as attorney Grahmn Morgan did here. (DNs 114, at PageID # 3432); (DN 115, at PageID # 3680); (DN 135, at PageID # 4835). Such a signature certifies to the Court that

[8] To be clear, the Court is not finding that Plaintiff's counsel was negligent, merely noting that even negligence—if assumed—would not suffice.

the legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law and that the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Fed. R. Civ. P. 11(b).

Yet Defendant's counsel has made representations to the Court that are simply not true. Counsel manipulated a quote from the Court's prior Order to change its meaning entirely. *Contrast* (DN 81, at PageID # 2533) ("The best evidence the Court can find of any written communications documenting Tiller's reasons for firing Plaintiff is in Plaintiff's deposition testimony…"), *with* (DN 114, at PageID # 3428) ("The [m]agistrate [j]udge has already found that the missing text messages where Tiller criticized Dorn would be among the 'best evidence . . . of any written communications documenting Tiller's reasons for firing [Dorn]'".) (citing (DN 81, at PageID # 2533)). Counsel also misrepresented the ruling of the Kentucky state court. Counsel repeatedly states that Plaintiff was sanctioned by the state court for "willful destruction of evidence." (*Id.* at PageID # 3420, 3430); (DN 115, at PageID # 3671); (DN 135, at PageID # 4827.) Yet upon reading the actual opinion from the state court, it is apparent that this is not what the state court held at all. It is troubling that counsel would misquote this Court's own orders in a motion before it. It is troubling that counsel would misrepresent to this Court the ruling of another court. It is troubling that counsel would strategically omit certain phrases from the record when citing to them in his motion, in such a manner as to change the meaning. Counsel should take care to ensure that the representations he makes to Court are based upon a reasonable inquiry into the facts and the law.

**I. The Court will permit Plaintiff to file in excess of the page limit.**

Responses may not exceed twenty-five pages without leave of Court. LR 7.1(d). Plaintiff has filed a Response totaling twenty-eight pages, and has sought leave of Court to do so. (DNs 126, 144.) Finding that the additional pages are necessary to address the complex arguments in Defendant's Motion (DN 115), Plaintiff's Motion for Leave is granted.

## III. Order

For the foregoing reasons,

IT IS HEREBY ORDERED that the Motions for Sanctions (DNs 114, 115) filed by Defendant Neil S. Dominique are **DENIED**. The Motion for Leave to File in Excess of Page Limits filed by Plaintiff Steven J. Dorn is **GRANTED**. (DN 144.)

August 21, 2026

Colin H Lindsay, Magistrate Judge
United States District Court

cc: Counsel of record